EL PUEBLO DE PUERTO RICO, demandante y apelante, *v.* JOSÉ SOTO ZARAGOZA y HARRY LAKE PENN, acusados y apelados.

Núm. 10547.—*Sometido:* Junio 7, 1951. *Resuelto:* Febrero 1, 1952.

*Hon. Procurador General Víctor Gutiérrez Franqui, J. Rivera Barreras, Fiscal del Tribunal Supremo* y *Frank Vizcarrondo Vivas, Fiscal Auxiliar,* abogados de El Pueblo, apelante; *Celestino Iriarte* y *F. Fernández Cuyar,* abogados de los apelados.

EL JUEZ ASOCIADO SEÑOR SNYDER emitió la opinión del tribunal.

José Soto Zaragoza y Harry Lake Penn fueron convictos ante el tribunal de distrito, sección de San Juan, por el delito de tener en su posesión material de bolita en violación de la sección 4 de la Ley núm. 220, Leyes de Puerto Rico de 1948 ((1) pág. 739). Apelaron para ante este Tribunal de la sentencia imponiéndoles términos de cárcel de dos y un año, respectivamente. Luego declaramos con lugar su moción para desistir del recurso. Entonces los acusados radicaron una moción en el tribunal inferior solicitando que se anulara la sentencia dictada por haberse obtenido mediante fraude. Luego de celebrada una vista en que se oyó a ambas partes sobre esta cuestión, el tribunal inferior declaró con lugar la referida moción. El caso se encuentra ahora ante nos en apelación del Pueblo contra la resolución de la corte inferior anulando la sentencia.(¹)

I

▮ Uno de los errores señalados por El Pueblo es en efecto que el tribunal de distrito cometió manifiesto error al apreciar la evidencia presentádale en relación con la moción para anular la sentencia. Este señalamiento hace necesario que hagamos un resumen de la evidencia pertinente que ambas partes presentaron durante el juicio y durante la vista de la moción.

---

(¹) Véase nuestra opinión en 72 D.P.R. 412, a tenor con la cual permitimos a Soto y a Lake Penn prestar fianza en lo que se resolvía este caso.

*Evidencia Durante el Juicio.*

*Modesto Castro*, detective, declaró que el 27 de mayo de 1950, a las 11 de la noche, estaba en el cuartel de la detective en la parada 6½, Avenida Fernández Juncos, en San Juan, con tres hombres que habían sido arrestados por bolita. Llegó un joven y preguntó por qué estaban arrestadas dichas personas. Le preguntó al joven si él "andaba" con ellos. El joven contestó en la negativa, diciendo que "andaba" con Soto. El Sargento Costas, que oyó la conversación, le dijo al testigo y al detective Quiñones que dieran una vuelta por allí.

Quiñones y el testigo se fueron por la Avenida Fernández Juncos hacia San Juan. Cuando habían andado como setenta pies del cuartel, vieron a Soto y a Lake Penn en el asiento delantero de un Cadillac con la luz interior encendida. Cuando estaban como a ocho pies del automóvil, vió que Soto tenía en sus manos papeles amarillos con listas de números consistentes de tres cifras "con unidades a la derecha". Para cerciorarse, usó un "flashlight" para ver los materiales que Soto y Lake Penn tenían en sus manos. Cuando se acercaron al automóvil, Lake Penn le dió a Soto otras listas, y Soto las puso todas juntas y las tiró al piso de atrás del automóvil. Le dijo a Quiñones que cogiera estas listas. Quiñones entró a la parte de atrás del automóvil y las recogió. Lake Penn trató de poner en marcha el automóvil, pero el testigo le apagó la ignición, subió al automóvil y lo llevó al cuartel.

Registraron a Soto en el cuartel y le encontraron ciertos documentos en el bolsillo derecho de su gabán, que luego fueron introducidos en evidencia. También le ocupó a Soto una fuerte suma de dinero, la cual, después de haberse estipulado que ascendía a $1,937, le fué devuelta a Soto. Identificó el testigo treinta y seis listas de números de tres cifras seguidas por un guión y otros números como las que había visto en manos de Soto y Lake Penn y las cuales Soto había tirado en la parte de atrás de su automóvil. Posteriormente, se admitieron en evidencia estas listas.

Después que los acusados fueron llevados al cuartel, él y Quiñones registraron el automóvil pero no encontraron ningún otro material de bolita. Encontraron algunas botellas de licor en el baúl del automóvil y algunos billetes de lotería e inscripciones de caballos de carrera en el compartimiento de guantes. El testigo explicó en detalle la forma en que se juega la bolita.

*Federico Quiñones*, detective, corroboró la declaración de Castro hasta el momento en que llegaron al automóvil Cadillac. Sin embargo, declaró Quiñones que los acusados solamente tenían billetes y listas de lotería en las manos cuando él y Castro los sorprendieron. El testigo entonces declaró que Lake Penn llevó el automóvil al cuartel, con Castro en la parte de atrás y él delante. Cuando llegaron, el testigo fué arriba para examinar las listas de lotería a ver si éstas contenían números de bolita. Mientras hacía esto, el detective Rivera Rosa lo llamó para que lo ayudara a registrar el automóvil. Cuando el testigo llegó a éste, abrió la puerta de atrás y encontró listas de bolita en el piso. Entonces dijo, "no busques más, aquí está la evidencia".

El Pueblo ofreció una declaración jurada de Quiñones, que en sustancia era igual a la declaración de Castro, con el fin de impugnar la declaración de Quiñones, la cual fué admitida en evidencia sin objeción de los acusados. Quiñones explicó que había decidido corregir los "errores" de su declaración jurada porque poco después de haberla suscrito su padre y su hermano murieron y su hermana fué recluída en el Manicomio Insular. A solicitud del fiscal, se puso a Quiñones bajo custodia con miras a procesarlo por perjurio.

*Ramón Pérez Méndez*, primer testigo de los acusados, declaró que la noche en cuestión él acompañaba a Soto y a Lake Penn, chófer de aquél, cuando fueron al cuartel de la policía en el automóvil de Soto después de enterarse del arresto de Santos Lake, medio hermano de Lake Penn. Estacionaron el automóvil como a cinco o diez pies del cuartel. Le preguntó a Castro cuál era la denuncia contra Santos. Castro

no contestó pero dijo "usted anda con Chichí". Quiñones y Castro fueron hacia el automóvil con el "flashlight" y él se fué con ellos. Ni Soto ni Lake Penn tenían nada en sus manos cuando Quiñones y Castro llegaron donde ellos. Los detectives abrieron la puerta de atrás y registraron el automóvil, pero nada encontraron. Quiñones subió a la parte de atrás y Castro delante. El testigo trató de subirse al carro pero Castro le dijo que no y que se fuera al cuartel. Llevaron el automóvil al cuartel. Quiñones se bajó del mismo y fué a una oficina donde estaba el Sargento Costas.

Castro se quedó en el carro. Quiñones y dos detectives más vinieron al automóvil. Ellos empezaron a registrarlo y Quiñones apareció con papeles de bolita que había encontrado en la parte de atrás del automóvil. Entonces Soto dijo, "¿Cómo diablos me van a meter preso"? Quiñones contestó, "Es imposible que yo vaya a meterle bolita en el carro puesto que no lo conozco a usted". Soto dijo entonces que esto les iba a costar caro, que "ustedes no me pueden meter preso de esta manera". Ni Soto ni Lake Penn fueron registrados antes de ir al cuartel.

*Harry Lake Penn* corroboró en sustancia la declaración de Pérez Méndez. Añadió que a solicitud de Castro abrió el baúl del automóvil cuando éste estaba estacionado en el cuartel. Mientras Soto y él sacaban cajas de licor del baúl, los detectives Quiñones, Luis Parrilla y Rivera Rosa vinieron del cuartel para registrar el automóvil. Quiñones abrió la puerta de atrás del automóvil y dijo, "está aquí, no busques más".

La policía hizo un inventario de las cajas de licor que había en el baúl y de los billetes de lotería e inscripciones de caballos que encontraron en el compartimiento de guantes y se los entregaron a Lake Penn, después que él firmó el inventario. Un detective le llamó un taxi en el que se fué, llevándose el licor, los billetes de lotería y las inscripciones. Varias hóras después, a las tres de la mañana, el Sargento Costas lo arrestó en la parada 15 de Santurce.

En el contrainterrogatorio el testigo declaró que había sido el chófer de Soto durante diez o quince años, que Soto tiene muchas casas y que no sabe si Soto se dedica a otros negocios. La declaración de Lake Penn de que le fué permitido irse del cuartel en un taxi luego del arresto de Soto fué corroborada por el chófer y por los archivos de la compañía de taxis.

Al declarar culpable a los acusados y sentenciarlos a cumplir penas de cárcel, la corte inferior dijo: "La corte le ha dado entero crédito a la prueba del Pueblo, al testimonio de Modesto Castro y al de Federico Quiñones Padró, aun cuando hay ciertas inconsistencias entre el testimonio prestado ante este Tribunal en el día de hoy y el prestado ante el Hon. Fiscal. Sin embargo, esas contradicciones no son sustanciales. Sustancialmente el testigo corrobora el testimonio de Modesto Castro. Pero aún así, el testimonio de Modesto Castro merece todo el crédito de este Tribunal."

Pasemos ahora a la evidencia aducida ante el tribunal de distrito en cuanto a la moción que luego fué radicada para que se anulara la sentencia dictada durante el juicio por el fundamento de que ésta fué obtenida mediante fraude. La teoría de Soto y Lake Penn al radicar la moción fué que un número de listas de bolita habían sido ocupadas en manos de Luis Santos Lake el 27 de mayo de 1950 y que algunas de ellas fueron puestas esa misma noche en el automóvil de Soto mientras aquél estaba estacionado cerca del cuartel de la policía.

### Evidencia Durante la Vista de la Moción Sobre Nulidad de Sentencia.

*Luis Santos Lake* declaró que él, Francisco Vázquez y un tal Muskus fueron arrestados el 27 de mayo de 1950 a las nueve de la noche por el delito de bolita. Los detectives le ocuparon tres paquetes de colectas de bolita en su poder. Declaró en qué forma había obtenido la posesión de los tres paquetes. Trabajaba para un banquero de bolita. Su tra-

bajo consistía en recoger las listas de bolita de los agentes del banquero en períodos regulares. Con el fin de identificar el agente de quien había obtenido cada lista, empleaba una palabra o número clave para cada agente. El número o palabra de cada agente era escrito al dorso de cada lista recogida de éste. Las listas recogidas de cada agente eran puestas en un paquete separado.

Los tres paquetes hallados en su poder cuando se le arrestó estaban marcados en la forma antes dicha. Uno era del Barrio Obrero y tenía la palabra "río" escrita al dorso de cada una de sus listas. Los otros dos eran de la calle Loíza y cada lista en estos paquetes estaba marcada "6" y "14", respectivamente. La colecta del "14" tenía la peculiaridad de que el "14" parecía en cada caso un "17". El testigo, Vázquez y Muskus fueron llevados al cuartel de la policía de la parada 6½ en San Juan y encerrados en la jaula. Los tres paquetes fueron puestos sobre un escritorio en el cuartel y no los volvió a ver.

Estuvo presente durante "algunas partes" del juicio de Soto y Lake Penn, que se celebró el 30 de junio de 1950. Se declaró culpable el 6 de julio del mismo año. Estuvo presente durante el juicio de Vázquez y Muskus el 13 de julio de 1950. Cuando se presentó en evidencia la colecta del "14" en el juicio de éstos, notó que el número de listas era considerablemente menor que cuando se las ocuparon a él. Originalmente, todas las tres colectas consistían más o menos del mismo número de listas.

Se les mostraron las listas presentadas en evidencia por El Pueblo en el juicio de Vázquez y Muskus. Éstas consistían de sesenta y dos páginas de la colecta del "6", de cincuenta y siete páginas de la colecta del "río" y de solamente once páginas de la colecta del "14". Las identificó como que eran las colectas del "6" y del "río" y *parte* de la colecta del "14" que le ocuparon el 27 de mayo al testigo. Entonces se le mostraron treinta y seis listas presentadas en evidencia por El Pueblo durante el juicio de Soto y Lake Penn. Mani-

festó que estas treinta y seis listas eran parte de la colecta del "14" ocupádale a él cuando se le arrestó. Estaba seguro de esto por dos motivos. Primeramente, cada una de estas treinta y seis listas tenía al dorso el mismo "14" escrito en forma peculiar—un "14" parecido a un "17"—que siempre fué escrito al dorso de cada lista de la colecta del "14". En segundo lugar, se acordaba de que él mismo había jugado quince centavos al número 101-CB con un bolitero llamado Pedrín Santiago, cuyas listas eran parte de la colecta del "14". Y ahora, examinando en la silla testifical los dos paquetes de listas con el "14" al dorso de cada lista—las once listas usadas en el juicio de Vázquez y las treinta y seis listas usadas en el juicio de Soto—encuentra una apuesta de quince centavos al número 101-CB a la cabeza de una de las treinta y seis listas y no encuentra tal apuesta en ninguna de las once listas. (²)

En el contrainterrogatorio declaró que el 27 de mayo de 1950 recogía listas de bolita para Roberto Andújar. No conoce a ningún otro bolitero. No sabe a qué negocio se dedica Soto aun cuando su medio hermano es el chófer de éste. Nunca ha oído mencionar el nombre de Soto como bolitero y nunca ha recogido bolita para él. Fué a ver al Lic. Jiménez Sicardó después del juicio de Vázquez y le dijo que investigara a ver si las listas presentadas en el caso contra el acusado tenían un "14" al dorso. Hizo esto porque su hermano estaba envuelto en el asunto. Sabía que su hermano y Soto habían sido arrestados y denunciados por bolita la misma noche en que se le arrestó a él, pero no vino al juicio de ellos a declarar. No sabe el nombre del agente de la colecta "14". Éste acostumbraba dejarle la colecta debajo de un zafacón cerca de un bar verde en la calle Loíza. Si bien no contó el número de listas de cada colecta, podía decir más o menos cuántas había en cada colecta cuando se las entregaban.

(²) El testigo explicó que "CB" significa "número combinado"; v.g., la apuesta es de cinco centavos a cada uno de los números 101, 110 y 011.

En el examen redirecto declaró que Soto fué arrestado y metido en la jaula con él alrededor de la medianoche del 27 de mayo de 1950. No fué a ver al Lic. Jiménez Sicardó hasta después del juicio de Soto porque no sabía qué colectas El Pueblo iba a presentar en evidencia contra Soto. Luego fué a ver al Lic. Jiménez Sicardó para decirle que mirara a ver si las listas usadas contra Soto eran las que le ocuparon al testigo.

En otro contrainterrogatorio manifestó que no creía que dos boliteros pudieran tener el mismo número de identificación al dorso de sus listas. En el examen redirecto declaró que él era la única persona a cargo de recoger la colecta "14" para Andújar y que él recogió todas las listas de la "14" el 27 de mayo de 1950. El agente "14" no escribía números para ningún banquero que no fuera Andújar.

El abogado *Gustavo Jiménez Sicardó* declaró que después de celebrado el juicio de Soto y Lake Penn el 30 de junio de 1950, Santos lo vino a ver a su oficina y le dijo "Para mí esa evidencia que le han puesto a Soto son los papeles que me cogieron a mí". Fué a la corte y vió el número parecido a un "17" al dorso de cada una de las listas presentadas en evidencia contra Soto. Le dijo esto a Santos, y éste le contestó que eran las de él. No pudo ver las listas en el caso contra Santos porque el caso no se había visto y el fiscal no se las dejó ver. Santos se declaró culpable el 6 de julio. El 13 de julio Vázquez y Muskus fueron juzgados. Santos declaró en el juicio. Vázquez fué declarado culpable y Muskus fué absuelto. En este juicio el fiscal de distrito admitió que la misma persona había escrito el "14" que se parecía al "17" al dorso de las listas presentadas en evidencia tanto en el caso de Vázquez como en el de Soto. (Esta misma admisión ya se había hecho durante esta vista.)

También se dió cuenta el testigo de una pieza adicional de evidencia durante el juicio de Vázquez. Explicó que "números limitados" son aquéllos que tienen un límite de apuestas porque son "números de sueño", o por algún otro motivo.

Vázquez le dijo que una lista de números de sueño que había sido presentada en evidencia contra Soto era suya y había sido ocupada en posesión del testigo la noche del 27 de mayo. Además, oyó a Vázquez declarar en el juicio de éste que el Sargento Costas fué a la oficina, cogió algunos de los papeles ocupádosle a Santos y se fué hacia el automóvil de Soto.

Varios días después, luego de celebrado el juicio contra Soto y Lake Penn, el testigo le preguntó a Santos si había algún otro medio fuera del número "14" escrito en dicha forma peculiar por el cual él podía identificar las listas de la colecta del "14". Después de pensar por un rato, Santos le dijo que él acostumbraba jugarle quince centavos al 101–CB en la colecta del "14" y que tal apuesta debía estar en las listas del "14" ocupádasle a él. El testigo vino a la corte y examinó las listas presentadas durante el juicio de Vázquez. Tal apuesta no aparecía en estas listas. Vino al Tribunal Supremo en donde estaba pendiente la apelación de Soto con el fin de ver las listas que habían sido presentadas en evidencia en el caso contra Soto y Lake Penn, pero no las pudo ver porque los *exhibits* estaban en un sobre cerrado.

*Francisco Vázquez Ortiz* declaró en la misma forma que Santos en cuanto al arresto de ellos, junto a Muskus, el 27 de mayo de 1950 a las nueve de la noche. En adición, declaró que cuando lo registraron los detectives le ocuparon un papel amarillo con números impresos que eran parte de un libro de sueños. Se le mostraron varios papeles que se presentaron en evidencia contra Soto durante el juicio de éste. Tomó de entre ellos un papel amarillo y dijo que éste era el que le ocuparon a él. Consistía el papel de una serie de números de tres cifras pero sin números a la derecha. Usaba el papel para "buscar los sueños para jugar". No tenía el papel relación alguna con el juego de bolita propiamente dicho.

El testigo, Muskus y Santos fueron encerrados en la jaula del cuartel de la policía después de haber sido arrestados. Como a las 11:45 de la noche, Castro tomó el material ocu-

pádole a Santos y lo llevó a la oficina de Costas poniéndolo sobre un escritorio. Costas y Castro empezaron a abrirlo. Consistía de tres paquetes de listas dentro de un cartucho de papel. Sacaron las listas de los paquetes y las regaron sobre el escritorio. Desde la jaula podía ver la entrada y también la parte de afuera. Como a medianoche vió entrar a un joven y preguntar por Santos. Castro le preguntó al joven si él andaba con ellos. Éste le contestó que andaba con Soto. Costas le dijo a Castro y a Quiñones que dieran una vuelta. Como 15 minutos después llegó un automóvil grande y se estacionó frente al cuartel directamente frente a la jaula, como a 25 pies de ésta. Se bajaron dos personas. Una de ellas, Quiñones, llevaba un paquete de billetes de lotería. Entró a la oficina de Costas y Parrilla y Rivera Rosa abandonaron la oficina.

Mientras Quiñones examinaba los billetes de lotería, Costas tomó un puñado de las listas que le habían ocupado a Santos y que estaban regadas sobre el escritorio. Salió afuera con las listas dentro del puño, se recostó sobre la parte trasera derecha del automóvil y puso las listas dentro del mismo. Entonces se alejó de éste. Ya no tenía las listas en el puño. Llamó a Quiñones para registrar el automóvil. Quiñones bajó y registró la parte de atrás del carro. Costas volvió a entrar al cuartel.

Entonces surgió una acalorada discusión entre Soto, Lake Penn y los detectives. Antes de que Costas bajara la escalera con las listas en el puño, el baúl del automóvil había sido registrado por los detectives Castro, Rivera Rosa y Parrilla mientras Quiñones examinaba los billetes de lotería. Como 15 minutos después Castro y Costas metieron a Soto en la jaula con los detenidos. Costas le dijo a Lake Penn que se llevara las cajas de licor encontradas por ellos en el automóvil. Costas le dijo a Lake Penn que se podía ir y éste se fué en un taxi, llevándose las cajas y los billetes de lotería, que se le devolvieron a Lake Penn. Soto no fué registrado personalmente. Vió a Lake Penn por la mañana en la cárcel.

En el contrainterrogatorio manifestó que no sabía a qué negocio se dedicaban Soto y Lake Penn. Le contó al Lic. Jiménez Sicardó el asunto de que Costas había cogido las listas y las había puesto en el automóvil, por primera vez el 11 de octubre de 1950. Ha cumplido dos sentencias de bolita y ahora es un chófer público.

*Ramón Rivera Vizcarrondo* declaró que dos o tres días antes del 27 de mayo de 1950 estaba en el tribunal de distrito para servir como jurado. Costas llegó con algunos boliteros que había arrestado. Oyó que Costas dijo, "Cogí a estos pequeños y voy a coger a Chichí con o sin colecta."(³) Fué a ver a su amigo Soto y le dijo lo que Costas había dicho. Entonces el fiscal de distrito dijo "En este momento yo solicito que se cite al Sargento Costas. Se le ha hecho una imputación a ese funcionario y es lógico que se defienda." La corte entonces ordenó que se citara a Costas para la mañana siguiente.

*José Soto Zaragoza* declaró que la noche en cuestión su automóvil fué registrado frente al cuartel por los detectives Quiñones y Castro. La luz interior estaba encendida y los detectives registraron la parte de atrás del automóvil con un "flashlight" pero nada encontraron. Quiñones fué entonces al cuartel con algunos billetes de lotería que le fueron ocupados al testigo mientras éste los tenía en sus manos.

Castro le quitó las llaves a Lake Penn y aquél y Parrilla fueron a registrar el baúl. No pudieron abrir el baúl y llamaron a Lake Penn para que lo abriera. Éste lo abrió y se encontraron algunas cajas de licor en el baúl. Castro ordenó a Lake Penn que las sacara. "Mientras se hacía eso pasó el Sargento Costas y se recostó sobre la puerta trasera del carro con el brazo derecho hacia adentro del carro mirando para atrás donde estábamos nosotros. Como el carro había sido registrado 2 veces por Parrilla y Rivera y Castro no le dí importancia. Él subió para arriba y al subir fué el de-

---

(³) Los testigos frecuentemente se refieren a Soto a través de sus declaraciones como "Chichí".

tective Quiñones y se dirigió hacia nosotros con unos papeles en las manos y dijo: 'No busquen más, aquí está.' Yo le dije: 'Mire bandido, ¿cómo usted dice que esto está aquí? Eso lo metería usted mismo ahí. Eso lo metió usted mismo ahí.'"

Quiñones y Parrilla fueron entonces al cuartel y se fueron para la parte de atrás con Costas. Dejaron al testigo y a Lake Penn frente al cuartel. Como a los 20 minutos Costas y Castro salieron y lo metieron en la jaula con Santos, Vázquez y Muskus. Lake Penn no fué arrestado y se fué en un taxi llevándose las cajas de licor y los billetes de lotería. Tres o cuatro horas más tarde arrestaron a Lake Penn. El testigo no fué registrado en el cuartel, pero sí en la cárcel, donde nada le encontraron excepto la suma de $1,937. Nunca antes había visto las listas de bolita que fueron presentadas en evidencia en el juicio en su contra. Explicó la naturaleza de varios otros documentos presentados en evidencia por El Pueblo, que es innecesario sintetizar aquí.

En el contrainterrogatorio explicó cómo se juega la bolita. Se dedicó a la bolita hasta el 3 de mayo de 1949, en que el detective Virella le "hizo un rancho". En dicha ocasión fué registrado en la calle y nada se le ocupó. Fué luego registrado en el cuartel y se le encontró un papel en el bolsillo. Explicó nuevamente la naturaleza de los documentos que no hemos descrito en detalle. Sabía lo que Rivera Vizcarrondo le había dicho antes de ser juzgado el 30 de junio de 1950, pero se enteró de la coincidencia en cuanto a los dos grupos de listas por primera vez después del juicio.

En el examen redirecto declaró que fué al cuartel de la policía a prestar fianza para un hermano de Lake Penn. Cuando se le preguntó si tenía consigo listas de bolita en dicha ocasión, replicó, "¿Cómo voy a ir yo frente al cuartel con listas de bolita?" De su anterior experiencia con la bolita, sabe que dos colectores no pueden usar el mismo número "14". Explicó la forma en que le robaron en cierta ocasión y esto dió lugar a que él ordenara que en lo sucesivo cada colector tendría que identificarse con un número. "Es igual con el

14": Un colector trabaja solamente para un banquero y el "14" solamente podía ser el número de un solo colector. De haber otro colector con el "14", éste tendría que ser un colector de otro banquero; de lo contrario, se cometerían errores pagando los premios.

El *Sargento Luis V. Costas* fué el único testigo por El Pueblo. Declaró que nunca habló con Rivera Vizcarrondo, a quien conoce de vista, el 27 de mayo de 1950, ni en ninguna ocasión anterior en relación con la bolita o con algún otro asunto. La transcripción de la evidencia presentada durante el juicio de Soto y Lake Penn fué también presentada en evidencia.

Entonces el tribunal de distrito dictó resolución anulando la sentencia de cárcel contra los acusados, por el fundamento de que dicha sentencia fué obtenida mediante fraude. La corte inferior basó esta resolución en sus conclusiones de hecho al efecto de que las listas de bolita que se alega fueron ocupadas en el automóvil de Soto la noche del 27 de mayo de 1950 habían sido de hecho ocupadas en posesión de otras personas arrestadas esa misma noche por el mismo delito; que estas listas fueron más tarde "fraccionadas o separadas"; y que parte de ellas fueron entonces "introducidas" en el automóvil de Soto con el fin de hacer aparecer que habían sido ocupadas en dicho automóvil.

Alegando que la corte inferior cometió error manifiesto en la apreciación de la evidencia en que basó sus conclusiones de hecho, el fiscal de este Tribunal hace hincapié en dos puntos: (1) ciertas discrepancias en el testimonio de los dos juicios; (2) los testigos que declararon que ellos vieron a Costas deliberadamente poner listas de bolita que habían sido ocupadas en posesión de Santos dentro del automóvil de Soto, eran boliteros declarados y sin duda mentían en cuanto a ciertos extremos; por ejemplo, que ellos nunca habían conocido a Soto como bolitero.

Estos dos puntos podrían en un caso común y corriente ser bastante persuasivos al juzgador de los hechos. Según

indica el Fiscal, hubo conflicto en el testimonio de varios testigos sobre diversos extremos: (1) si el automóvil estaba estacionado frente al cuartel o a 70 pies de distancia cuando los detectives por primera vez llegaron al mismo; (2) si los acusados tenían material de bolita, billetes de lotería, o nada en sus manos en ese momento; (3) quién llevó el automóvil al cuartel desde el sitio en que originalmente estaba estacionado. En el caso corriente estas discrepancias, que son aparentes de nuestro resumen de la evidencia, quizá tendrían considerable peso en cuanto a la credibilidad general de los testigos en cuestión. En igual forma, los records penales de los testigos principales del acusado, el parentesco de uno de ellos con Lake Penn, y el hecho de que obviamente estaban mintiendo en parte de sus testimonos, de ordinario arrojaría dudas a su credibilidad. Pero aquí, la razón poderosa que indudablemente convenció a la corte inferior de que los boliteros y no los detectives habían dicho la verdad *en cuanto a los hechos principales en controversia,* fué la evidencia documental.

No puede negarse razonablemente que las listas presentadas en evidencia contra Soto y Lake Penn eran parte de la colecta del "14" que Santos recogió durante la noche del 27 de mayo del agente que se identificaba con el "14". Una vez que se admite eso, es difícil imaginarnos en qué forma pudo la colecta del "14" haberse ocupado la misma noche en dos partes diferentes, una en manos de Santos y otra en el automóvil de Soto, respectivamente. Por el contrario, en ausencia de una explicación plausible en contrario, es lógico suponer que una vez que Santos recibió la colecta "14" del agente, cuando se le arrestó la tendría completa todavía o ya la habría entregado completa al banquero. Pero ambas partes convienen en que Santos tenía en su poder por lo menos parte de la colecta del "14" cuando se le arrestó. Por tanto, forzoso es concluir que él tenía en ese momento la colecta completa. Y el hecho de que más tarde algunas de las listas se desaparecieran de la custodia de los detectives y

aparecieran en el automóvil de Soto estacionado cerca del cuartel de la policía, es altamente corroborativo del testimonio oral de que estas listas fueron puestas en el automóvil de Soto.

Si bien no tan convincente como lo anterior, tres piezas de evidencia prestan algún apoyo a la teoría de los apelados. La primera es la admisión de que una lista de "números de sueños" fué hallada entre los documentos introducidos en evidencia contra Soto. Sin embargo, Vázquez declaró que la lista era de él y que había estado en su posesión cuando se le arrestó en unión a Santos. La segunda es que una apuesta del número "101–CB con 15 centavos" fué hallada en una de las listas presentadas en evidencia contra Soto. Pero Santos declaró que él había hecho precisamente esta apuesta y que estaba incluída en la colecta del "14". La tercera es que Santos declaró que las tres colectas contenían más o menos el mismo número de listas. Y, como hemos visto, las treinta y seis listas de la colecta "14", presentadas en el juicio de Soto, más las once listas de la misma colecta presentadas en el juicio de Vázquez, se aproximan al número de listas en las colectas "río" y "6", respectivamente.

Si bien no muy significativos por sí solos, hay otros dos episodios de carácter negativo que tienden a confirmar la teoría de que se perpetró una celada contra Soto. Los detectives no ocuparon los $1,937 que él tenía; tampoco arrestaron a Lake Penn en el sitio del supuesto delito. Si en verdad hubieran sorprendido a Soto y a Lake Penn manipulando material de bolita en el automóvil del primero cerca del cuartel de la policía, probablemente hubieran ocupado el dinero para una posible confiscación en relación con la denuncia por bolita. Y también habrían probablemente arrestado en seguida a Lake Penn en vez de arrestar a Soto y dejar ir a Lake Penn, para luego arrestarlo varias horas después, cuando más tarde se les ocurrió que el haberlo dejado ir era inconsistente con su cuento fabricado de que Soto y Lake Penn habían estado manipulando material de bolita *conjuntamente.*

Estas dos omisiones de los detectives, consideradas a la luz de toda la otra evidencia en el caso, parecen indicar que la mente del cabecilla estaba tan intensamente enfocada en la combinación de tenderle una celada a Soto que omitió dos pasos obvios que debió dar para evitar la imputación de que la evidencia contra Soto había sido fabricada.

Debemos añadir que Soto declaró que había sido un banquero de bolita. La policía sabía esto y estaba tratando de sorprenderlo. *Cf. Pueblo* v. *Soto,* 71 D.P.R. 830. En consecuencia parece difícil creer que él se fuera a estacionar cerca del cuartel de la policía—ya fuere a diez o a setenta pies de distancia—y procediera a manipular listas de bolita con su chófer.

A primera vista parece dudoso que un funcionario de la policía se dedique a fabricar una celada tan patente y flagrante a la clara vista de los ocupantes de la jaula. Pero puede ser que Costas no se diera cuenta de que ellos lo podían ver o de que lo estaban observando. Además, es obvio que él no sabía que las listas que iba a poner en el automóvil de Soto podrían ser inequívocamente identificadas como pertenecientes a la colecta "14" originalmente entregadas a Santos por el agente. Por tanto quizás Costas pensó que se reducía solamente a una cuestión de su palabra frente a la palabra de boliteros. Bajo estas circunstancias, quizás estaba confiado en que el tribunal de distrito no daría crédito al testimonio oral de los boliteros al efecto de que las listas habían sido puestas en el automóvil de Soto, especialmente cuando ésta es una defensa favorita, aun cuando casi siempre falsa, que presentan los acusados a quienes se les imputa la posesión de tales cosas como material de bolita o drogas narcóticas. De cualquier modo, cualquiera que haya podido ser el razonamiento de Costas, no podemos ignorar la altamente significativa evidencia documental simplemente porque la conducta atribuída a Costas no solamente fué corrupta sino también temeraria. A este respecto, creemos que es significativo el hecho de que Costas nunca negó la imputación de que había

puesto listas de bolita en el automóvil de Soto, no obstante el hecho de que él ocupó la silla testifical para negar la imputación comparativamente trivial de que una vez amenazó con arrestar a Soto "con o sin colecta".

El Fiscal de este Tribunal arguye que cuando Soto en su declaración explicó por qué el número "14" fué puesto al dorso de las listas para una colecta específica y por qué el "14" no podría ser usado por ningún otro agente del mismo banquero, Soto en efecto admitió que esta colecta fué hecha para él como banquero. No interpretamos su declaración en esta forma. Según la leemos, Soto indicaba de manera general por qué él y otros banqueros decidieron evitar problemas en cuanto al pago de los premios identificando cada colecta con un número clave. Pero aún si supusiéramos que Soto prácticamente admitió que la colecta era para él y que Santos mintió cuando dijo que era para Andújar, no podemos ver en qué forma eso ayuda el caso del apelante.

A Soto no se le juzgó por operar una banca de bolita. Se le acusó de estar en posesión de ciertas listas de bolita. En sus conclusiones de hecho el tribunal de distrito resolvió que Santos, y no Soto, había estado en posesión de estas listas y que luego éstas fueron puestas en el automóvil de Soto. Si aceptamos estas conclusiones, es inmaterial, a los fines de este caso, el que Santos recogiera estas listas para el banquero Andújar o para el banquero Soto. Si Soto es un banquero, debiera ser acusado, juzgado, convicto y sentenciado por tal delito. Pero si aceptamos las conclusiones de hecho de que las listas en cuestión fueron ocupadas en manos de Santos y puestas en el automóvil de Soto, no podemos permitir que subsista una sentencia condenatoria por el delito de poseer las listas, simplemente porque se pueda concebiblemente inferir del récord que Santos tenía esas listas como empleado de Soto. Bajo dichas circunstancias, el fraude vició la sentencia emitida por el delito de posesión independientemente de si Soto es culpable o inocente de un delito diferente—la ope-

ración de una banca de bolita—que todavía no se le ha imputado.

Según indicamos en el resumen que de la evidencia hicimos, durante el juicio de los acusados se presentaron en evidencia ciertos documentos además de las listas de la colecta "14". Sin embargo, contrario a las listas de bolita que se alega fueron encontradas en el automóvil de Soto, estos otros documentos no son materiales típicos de bolita como los que se ocuparon en los casos de *Pueblo* v. *Mantilla*, 71 D.P.R. 36, 52 y *Pueblo* v. *Acevedo*, 70 D.P.R. 562. Toda vez que dichos documentos no son prima facie incriminatorios, es innecesario que examinemos en detalle el testimonio de Soto en el contrainterrogatorio al efecto de que estaban relacionados con sus negocios de caballos y de club nocturno. Basta decir que nada hay en el récord que demuestre afirmativamente, bien de la faz de los documentos o de cualquier evidencia que los explique, que estos otros documentos eran material de bolita. Llegamos a la misma conclusión en relación con el único otro documento introducido en evidencia en el juicio de Soto y Lake Penn; es decir, la lista impresa de "números de sueños" que consistían de tres cifras *sin* número otro alguno a la derecha. Fuera del hecho de que Vázquez declaró—y la corte inferior aparentemente le dió crédito—de que esta lista le pertenecía y le fué ocupada a él, la misma meramente consiste de una serie de números de tres cifras con un título parcialmente roto, y con la parte restante leyendo "...os a $4.00".

Creemos que del análisis anterior surge claro por qué no podemos decir, particularmente con vista de los hechos objetivos y físicos que surgen de la evidencia documental, que la corte inferior cometiera manifiesto error en sus conclusiones de hecho de que las listas de bolita que se alega fueron encontradas en el automóvil de Soto fueron realmente puestas allí después de ocuparse en manos de Santos.

■ La evidencia aducida en apoyo de una moción en un caso criminal para que se anule una sentencia por el fundamento de que fué obtenida mediante fraude, debe esta-

blecer hechos que de haberse conocido al momento del juicio probablemente hubieran evitado una convicción. *Pueblo* v. *Gerena*, 72 D.P.R. 222, 235; *People* v. *Adamson*, 210 P. 2d 13, 15 (Cal., 1949); *People* v. *Shorts*, 197 P. 2d 330, 333, (Cal., 1948); *Brown* v. *State*, 35 S. 2d 518, 519 (Ala., 1948); *Anderson* v. *Buchanan*, 168 S. W. 2d 48, 53 (Ky., 1943); *State* v. *Gentry*, 62 N. E. 2d 860, 862 (Ind., 1945); 59 Yale L. J. 786, 788. No hay duda de que la prueba en este caso cumple con este requisito. En verdad, el Fiscal admitió esto en la vista oral. Su único argumento, que hemos rechazado, es que la corte inferior cometió manifiesto error al dar crédito a esta prueba.

Finalmente, hemos resuelto que un acusado tiene una ímproba tarea cuando como aquí ataca una sentencia por el fundamento de que fué obtenida por fraude. *Pueblo* v. *Méndez*, 67 D.P.R. 829, 834; *Pueblo* v. *Gerena*, supra, pág. 228. Pero, aceptando como hemos aceptado las conclusiones de hecho en este caso, es obvio que estos hechos cumplen con el requisito establecido en la jurisprudencia; v. g., que éste no era simplemente el caso de testigos del Pueblo que quizás cometieron perjurio, sino un plan deliberadamente trazado y ejecutado con cuidado para defraudar al tribunal de distrito.

## II

Una sentencia no puede anularse por el fundamento de que se obtuvo mediante fraude a menos que la parte actora convenza al tribunal sentenciador de que ella no pudo haber descubierto la evidencia de fraude mediante diligencia razonable antes de que se dicte la sentencia. *Pueblo* v. *Méndez*, supra, pág. 834; *Pueblo* v. *Gerena*, supra, pág. 228. El Pueblo arguye que los apelados no cumplieron con este requisito y que Soto conocía o pudo haber descubierto sin dificultad la evidencia en cuestión antes de dictarse sentencia.

Convenimos con el Fiscal de este Tribunal en que Soto sabía antes del juicio que le habían tendido una celada. En verdad, en el mismo momento en que los detectives afirmaron

que habían encontrado listas de bolita en su automóvil, Soto tuvo indudablemente que darse cuenta de lo que había ocurrido. Pero saber que uno es inocente y que ha sido víctima de una celada, dista mucho de poder pròbarse. En una situación algo similar hemos resuelto que tal conocimiento subjetivo, sin prueba de ello, no impide una moción para anular una sentencia cuando la prueba en apoyo de la moción fué obtenida después de dictada la sentencia. *Pueblo* v. *Gerena*, supra, págs. 233–34.

Las listas que se alega fueron encontradas en el automóvil de Soto no se produjeron hasta que éste fué juzgado el 30 de junio de 1950. Aun en este momento, si bien Soto sabía que no eran de él, no tenía medio de saber, según su testimonio, que las mismas pertenecían a Santos. Fué solamente después de haber sido convicto y sentenciado que Santos, quien había estado presente durante parte del juicio, fué a ver al abogado Jiménez Sicardó con su sospecha de que las listas eran parte de las que le fueron ocupadas a Santos. Y Vázquez no reveló su conocimiento de la celada hasta que su caso fué visto. Presumiblemente prefirió en interés propio esperar su juicio para hacer un relato tan incriminatorio contra los detectives.

Soto pudo haber declarado durante su juicio que él vió a Costas recostado sobre su automóvil. Y pudo haber citado a Rivera Vizcarrondo en el juicio, en vez de esperar a traerlo durante la vista de la moción, para declarar en cuanto a la alegada amenaza de Costas de que iba a arrestar a Soto "con o sin colecta". Pero difícilmente podemos decir que estos dos episodios serían suficientes para sostener una imputación de celada. La prueba importante y decisiva, particularmente la prueba documental, no fué descubierta hasta después del juicio y sentencia. En verdad, de no haber sido por la forma peculiar en que se escribió el número "14", Santos y Vázquez quizás nunca hubieran hablado y la celada jamás se hubiera descubierto.

Aun el Fiscal de este Tribunal no alega que después que Santos fué a ver al abogado Jiménez Sicardó con sus sospechas, Soto no fué diligente. Hizo varios esfuerzos infructuosos para obtener un remedio en la corte inferior. Luego, como su caso para esa fecha estaba en apelación ante este Tribunal, Soto y Lake Penn voluntariamente desistieron de su apelación, diciendo que hacían esto con el fin de radicar la moción aquí envuelta ante el tribunal de distrito para que se anulara la sentencia por el fundamento de que la misma había sido obtenida mediante fraude. *Pueblo* v. *Méndez*, supra, pág. 833, escolio 1.

Es una cuestión de hecho el determinar si la evidencia de fraude fué descubierta después de sentencia. La corte inferior aparentemente dió crédito al testimonio de los testigos de los apelados al efecto de cuándo fué que se descubrió la evidencia de fraude. Aquí tampoco podemos decir que esto fué error manifiesto. Y una vez que aceptamos este testimonio, es aparente que los apelados cumplieron con el requisito de que deben demostrar que no pudieron haber descubierto la evidencia de fraude mediante diligencia razonable con anterioridad a la fecha de la sentencia. *Pueblo* v. *Méndez*, supra; *Pueblo* v. *Gerena*, supra; *People* v. *Adamson*, supra, pág. 16; *People* v. *Shorts*, supra, pág. 336.

### III

El tercer señalamiento es que el juez Ramírez Pabón cometió error al presidir la vista de la moción, dado el hecho de que el juez Torres Aguiar, quien presidió el juicio, estaba disponible para ver la moción.

Convenimos que como regla general el juez que oyó un caso originalmente, de estar disponible, debiera oír una moción para anular la sentencia dictada en el juicio, ya que dicho juez está en mejor posición que cualquiera otro para determinar la verdad. Pero no se demostró que el juez Torres Aguiar estuviera disponible. Por el contrario, tomamos conocimiento judicial de que preside regularmente

la Sección de Humacao del Tribunal de Distrito y de que presidió el juicio de Soto y Lake Penn en la Sección de San Juan en comisión. Cuando se radicó la moción sobre nulidad de sentencia, la misma se señaló debidamente ante el Juez Ramírez Pabón, un juez regular de la Sección de San Juan. En ese momento el gobierno tenía el derecho de tomar cualesquiera pasos necesarios para que el Juez Torres Aguiar fuera comisionado para oír la moción. No tomó tal acción. Por el contrario, afirma ahora por primera vez en apelación que el Juez Torres Aguiar y no el Juez Ramírez Pabón debió haber oído la moción. Esta contención es ya muy tardía. El Pueblo renunció cualesquiera derechos que pudiera tener a una vista ante el Juez Torres Aguiar al no tomar acción adecuada para su nombramiento en comisión. *Cf. State* v. *Gentry*, supra; *Bolton* v. *State*, 60 N. E. 2d 742 (Ind., 1945).

## IV

El cuarto señalamiento es que los apelados no tenían derecho a radicar su moción sobre nulidad de sentencia sin permiso anterior de este Tribunal. El gobierno arguye que la sentencia ha sido confirmada; que la moción está dirigida a dejar sin efecto nuestro mandato ordenando la ejecución de la sentencia; y que en consecuencia tal acción no podía tomarse sin permiso nuestro.

Aparte del hecho de que no confirmamos la sentencia porque Soto y Lake Penn voluntariamente desistieron de su apelación, la contención de El Pueblo malinterpreta el propósito de esta moción. La misma nada tiene que ver directamente con nuestro mandato. Más bien alega que el fraude se perpetró contra la corte de distrito. Y hemos resuelto que bajo tales alegaciones la corte inferior debe pasar sobre el asunto en primera instancia. *Pueblo* v. *Méndez*, supra, págs. 833–34. Al considerar la moción el tribunal de distrito en consecuencia no burló nuestra autoridad. Por el contrario, correctamente ejercitó la autoridad necesariamente conferídale para dejar sin efecto una sentencia obtenida mediante fraude

perpetrado sobre la propia corte inferior. Algunos casos sí resuelven que bajo estas circunstancias el permiso de la corte apelativa es necesario. Pero el peso de las autoridades, con el cual convenimos, es que no se necesita tal permiso. Anotaciones, 146 A. L. R. 1230, 145 A. L. R 818; Nota, 59 Yale L. J. 786, 788. Los casos en que descansa el gobierno— *Taylor* v. *Alabama*, 335 U. S. 252, y *Hysler* v. *Florida*, 315 U. S. 411—nada tienen que ver con el problema aquí envuelto. Meramente dichos casos rechazan la contención de un acusado de que un estatuto o caso que *requiere* tal permiso viola el debido procedimiento de ley.

El Fiscal de este Tribunal también arguye bajo este señalamiento que el único remedio de los apelados era radicar una petición de hábeas corpus y probar que el fiscal de distrito *a sabiendas* hizo uso del testimonio perjuro de un testigo esencial. Los casos resuelven que tal conducta inescrupulosa del fiscal de distrito es una negación del debido procedimiento de ley y amerita la libertad mediante hábeas corpus. *Mooney* v. *Holohan*, 294 U. S. 103; *Hysler* v. *Florida*, supra, pág. 413; *Pyle* v. *Kansas*, 317 U. S. 213, 216; *White* v. *Ragen*, 324 U. S. 760, 764. Pero estos casos nada tienen que ver con nuestro problema. Aquí el fiscal de distrito no produjo deliberadamente testimonio perjuro. Hasta donde el fiscal sabía, los hechos eran como la corte de distrito los encontró probados en el juicio original. Por consiguiente, en este caso no podía levantarse cuestión constitucional alguna en relación con falta del debido procedimiento. Más bien los apelados sostienen que hubo una celada por otras personas que no solamente cometieron perjurio si que también deliberadamente planearon y ejecutaron con cuidado una celada para defraudar al tribunal de distrito. Bajo dichas circunstancias ellos tenían derecho a radicar una moción dentro del caso original alegando estos hechos. *Pueblo* v. *Gerena*, supra; *People* v. *Adamson*, supra, pág. 16.

Agregaremos unas palabras finales en relación con las implicaciones de este caso. La bolita es un mal grave en

Puerto Rico y las autoridades merecen elogios por sus vigorosos esfuerzos para erradicarlo. Véase *Pueblo* v. *Mantilla, supra,* pág. 49. Más aun, en su propia declaración Soto demostró que es un individuo altamente indeseable y que ha jugado un papel importante en el daño infligido a esta comunidad como resultado de la operación de bancas de bolita. No tenemos duda de que si continúa sus prácticas nefandas, con el tiempo será sorprendido y castigado.

Sin embargo, aquí hay envuelto algo más que la inocencia o culpabilidad de un individuo en particular. Esta fué una celada en la cual participaron solamente un oficial de la policía y uno o dos de sus subalternos. Pero al así hacerlo éstos han tratado de infligir una herida mortal al corazón de nuestras instituciones democráticas. Hoy tal celada puede envolver un hombre culpable. El próximo paso sería dirigirla contra un inocente. Tenemos la certeza que se tomarán las medidas necesarias para evitar la repetición de estas prácticas perniciosas. Véase *Hazel-Atlas Co.* v. *Hartford Co.,* 322 U. S. 238, 246.

*La resolución del tribunal de distrito anulando la sentencia condenando a Soto y a Lake Penn a penas de cárcel, por el fundamento de que la misma fué obtenida mediante fraude, será confirmada.*

Opinión concurrente emitida por el Juez Presidente Señor Todd, Jr.

Aun cuando concurro en un todo con la opinión del Tribunal, considero imprescindible hacer algunos comentarios en torno a los razonamientos y conclusiones expuestos en la opinión disidente del Juez Asociado Sr. Negrón Fernández.

Este Tribunal se ha limitado a aplicar en este caso la tan conocida y reiterada regla de que no intervendrá con la apreciación que de la prueba haga un tribunal inferior a menos que se nos demuestre que en dicha apreciación se incurrió en manifiesto error o se actuó movido por pasión, prejuicio o parcialidad. Ninguna autoridad se cita para sostener que en el presente debamos variar dicha regla y resol-

ver el caso según la apreciación personal que hagamos de la prueba. Así enfocada la cuestión y después de analizar imparcialmente la prueba que ante sí tuvo el tribunal inferior, sin especulaciones y sin forzar implicaciones no necesariamente sostenidas por dicha prueba, llegamos a la conclusión de que dicho tribunal no cometió manifiesto error en su apreciación.[1] El hecho de que esa conclusión conlleve para funcionarios públicos que falten a su deber la responsabilidad que en ley proceda, no puede ser un obstáculo para que este Tribunal, al igual que el tribunal sentenciador, cumpla a cabalidad con el suyo.

Considero que las implicaciones que se hacen y las conclusiones a que se llega en la opinión disidente reflejan, como es natural, la apreciación personal que su autor hace de la prueba y, si el tribunal inferior hubiera llegado a esas mismas conclusiones a través de los mismos razonamientos e implicaciones, probablemente su criterio hubiera sido respetado por este Tribunal. No nos corresponde, sin embargo, actuar como si fuéramos un tribunal de primera instancia y, frente a las conclusiones a que llegó el tribunal a quo—sostenidas por la prueba—colocar nuestras propias conclusiones y deducciones y hacer que éstas prevalezcan. Esa nunca ha sido la misión de este Tribunal.

Ahora bien, y pasando a otros aspectos del caso, es conveniente recordar que la doctrina de *falsus in uno, falsus in omnibus* en relación con declaraciones de testigos,[2] ha sido rechazada por este Tribunal precisamente en el caso de *Pueblo* v. *Nieves*, 57 D.P.R. 784, 799, donde dijimos:

". . . Cuando el testigo falta a la verdad en una parte de su declaración, deberá ponerse en duda el resto de la misma, *pero ello no quiere decir que debe rechazarse por completo*. El Jurado actuará con cautela sabiendo que no camina por terreno

[1] No hay aquí imputación alguna de pasión, prejuicio o parcialidad.

[2] El artículo 524 del Código de Enjuiciamiento Civil, inciso 3 (artículo 162, Ley de Evidencia), dice que: "Un testigo que hubiere faltado a la verdad en una parte de su declaración, deberá ponerse en duda respecto a otras."

firme, *pero si en el ejercicio de su discreción se convence de que el resto de la declaración es verdadero, puede tomarlo en consideración para rendir su veredicto."*   (Bastardillas nuestras.)

Y en California se ha resuelto que la doctrina a que nos hemos referido no puede invocarse en apelación para revisar los hechos que la corte inferior consideró probados de acuerdo con la prueba, ya que ella constituye una guía para aquéllos que tienen que oír y ver a los testigos y en esa forma pasar sobre la prueba en primera instancia. *Brandt* v. *Krogh*, 111 Pac. 275, 279.

Siendo ésta la regla prevaleciente el tribunal inferior no estaba obligado a rechazar en su totalidad las declaraciones de los testigos de los apelados.   Y esa prueba oral, unida a la documental, es a mi juicio suficiente para sostener la sentencia recurrida.

En cuanto a qué interés podían tener los funcionarios envueltos en este caso en perpetrar el fraude es cosa que ellos sabrán.   Sí sabemos del hecho, del cual podemos tomar conocimiento judicial, de que han sido ascendidos en sus cargos, no obstante estar pendiente esta acción ante este Tribunal.

Creo errónea la conclusión a que se llega en la opinión disidente al efecto de que solamente en casos en que se arreste por operar una banca de bolita es que procede ocuparse el dinero que tenga la persona arrestada.   También el que está en posesión de listas de bolita puede tener dinero conectado con dicho juego.   De todas maneras no corresponde a la policía determinar qué piezas de evidencia debe o no ocupar.   Su deber es ocuparlas todas.   Además, es incomprensible que se sostenga por una parte que Soto era el banquero de *todas* las colectas—no sabemos a cuánto sumaban las cantidades jugadas en todas las listas—y por otra se diga que las ocupadas a él sólo montan a $61.49.

Para mí continúa siendo fantásticamente inverosímil que los apelados en este caso se situaran cerca de un cuartel de la policía a manipular material de bolita, no importa que hubiera una guagua frente a su automóvil.   Empero, si estu-

viéramos resolviendo la apelación en el caso original, habiéndole dado crédito el tribunal sentenciador a esa prueba, también respetaríamos su conclusión.

Personalmente creo—y a algunas de mis opiniones disidentes en el pasado me remito—que este Tribunal ha sido extremadamente liberal en su interpretación de la Ley de la Bolita y especialmente en cuanto a no exigir el cumplimiento estricto de la ley sobre órdenes de allanamiento obtenidas por la policía en casos de bolita. Creo además que posiblemente esta actuación nuestra haya traído como consecuencia una situación de hechos como los revelados en el presente caso, es decir, que pueden existir miembros de la policía que en efecto crean que cualquier actuación de su parte y por ser los acusados boliteros habrá de ser aprobada por los tribunales de justicia. Es hora de que sepan que están equivocados y que aun los "personajes del hampa" tienen derecho a ser juzgados y convictos únicamente por los medios lícitos que disponen nuestras leyes.

Desconozco quiénes son los "personajes del hampa" dedicados al juego ilegal de la bolita. Si alguno ha escapado de las garras de la ley, ello se ha debido únicamente a que los hechos y la ley así lo han justificado—véase a ese efecto el caso anterior contra Soto en *Pueblo* v. *Soto*, 71 D. P. R. 830, en el cual revocamos la sentencia debido a que el registro llevado a cabo por la policía fué ilegal—(³) y no debido a ninguna otra circunstancia.

Opinión disidente del Juez Asociado Señor Negrón Fernández.

Por segunda vez José Soto Zaragoza—uno de los personajes del hampa, dedicado al juego ilegal de la bolita—escapa de las garras de la ley.

Primero—con mi voto a favor y sin intervención del Juez Asociado Sr. Snyder—revocamos una sentencia en su contra,

---

(³) Ese fué el caso a que se refirió Soto al decir que había sido objeto de un "rancho" por parte del detective Virella y de la opinión rendida en dicho caso, escasamente puede colegirse que dicha afirmación sea "absurda".

por el fundamento de que la evidencia que sirvió de base a su convicción fué obtenida mediante un registro ilegal efectuado en el cuartel de la policía, por haber sido igualmente ilegal su arresto previo. *Pueblo* v. *Soto*, 71 D.P.R. 830.

Ahora—con mi disenso—el Tribunal confirma un fallo anulando una sentencia en su contra, bajo la teoría de que su convicción fué obtenida mediante fraude, habiendo consistido éste en que ciertas listas de números de bolita—que se admitieron en evidencia en el juicio contra él—fueron puestas en el automóvil en que se encontraba por un miembro de la detective con el único fin de fabricar un caso en su contra.

La opinión del Tribunal acepta las conclusiones—erróneas a mi juicio—a que llegó el tribunal inferior a base de prueba desacreditada y esencialmente perjura, y condena de antemano, injustificadamente, con dureza implacable, a varios —uno en particular—de los miembros de la detective, como autores de una criminal conspiración para obtener la convicción de José Soto Zaragoza y Harry Lake Penn por infracción a la sección 4 de la Ley de Bolita.

Si detestable y atentatorio "al corazón de nuestras instituciones democráticas" es una conspiración entre oficiales de orden público para lograr la convicción de dos ciudadanos con prueba perjura y evidencia ajena, en igual forma peligroso y atentatorio a la permanencia y disfrute de la democracia en una de sus más vitales funciones—la función judicial—es permitir que se destruya la virtualidad de los fallos de los tribunales dejándolos a merced de quienes, en su propio interés, tejen con falsos testimonios—tomando ventaja de un hecho que pertenece al campo de sus propias actividades clandestinas—la madeja de un fraude inconcebible para dar color a la leyenda de una conspiración fraguada entre oficiales de orden público para condenar a esos dos ciudadanos.

Al igual que lo hace el Tribunal en su opinión—ya que de ello no puede prescindirse al considerar la prueba que tuvo ante sí el tribunal inferior para anular por fraude la senten-

cia condenatoria—he de comenzar haciendo mi propio resumen, tanto de la prueba pasada en el juicio contra José Soto Zaragoza y Harry Lake Penn, como de la pasada en la vista de la moción sobre nulidad de sentencia.

LA PRUEBA PASADA EN EL JUICIO.

*Modesto Castro*, detective, declaró que el 27 de mayo de 1950 prestaba servicios como tal en la zona metropolitana, en el escuadrón contra el vicio comandado por el Sargento Luis V. Costas. Como a las 11 de la noche se encontraba en el cuartel de la detective en la Parada 6½ en la Avenida Fernández Juncos, en San Juan, con tres "arrestados" por ley de bolita. Llegó un joven como de 23 años, blanco, y se dirigió al testigo inquiriendo por qué estaban arrestados aquellos tres "jóvenes". Castro le preguntó que qué parentesco tenía y si andaba con ellos, a lo cual aquél contestó: "No, yo ando con Chichí". Castro volvió a preguntarle "¿dónde está Chichí?", contestándole el joven de referencia "Yo no sé". Entonces el Sargento Costas instruyó al testigo para que diera una vuelta "por ahí" con Quiñones, otro detective.

Castro y Quiñones salieron del cuartel y caminaron por el lado sur de la Avenida Fernández Juncos en dirección a San Juan, Quiñones por el lado de adentro y el testigo por el lado de afuera, hasta que llegaron a una guagüita comercial vieja detrás de la cual estaba estacionado un automóvil Cadillac. Dentro de éste y en el asiento delantero, estaban los acusados con la luz interior encendida. Tanto la guagüita comercial como el automóvil Cadillac miraban en dirección de San Juan a Santurce, a su derecha, contiguos a la acera. El automóvil estaba estacionado a 5 ó 6 pies de distancia de la guagüita, frente a "la entrada para el muelle número doce".

Al lado del cuartel de la detective, con un callejón que los separa, está el edificio de la "Pontiac", luego otro edificio y por último un puesto de gasolina que hace esquina con la ca-

lle de entrada al Muelle núm. 12. Desde la guagüita, el cuartel quedaba "a una distancia más o menos de la esquina de la calle San José", "aproximadamente a 70 pies". Cuando el testigo pasó la guagüita, estando a 6 u 8 pies de distancia, vió el automóvil Cadillac y en él a los acusados, que tenían en sus manos listas de papel, con números de tres cifras y unidades a la derecha. Aun cuando la luz interior del automóvil estaba encendida, Castro usó también su linterna (*flashlight*) "para estar más seguro". Harry Lake Penn hojeaba las listas que tenía en sus manos a la altura de la correa y Soto Zaragoza pasaba las que tenía de una mano a la otra, "las barajaba moviéndolas de un lado a otro". Al notar los acusados la presencia de los detectives, Lake Penn pasó las listas que tenía en sus manos a Soto Zaragoza y éste las juntó y las tiró a la parte de atrás, al piso del automóvil. Lake Penn, que estaba sentado frente al guía del automóvil, trató de poner éste en marcha, pero Castro le quitó el "switch". "Fué una cosa momentánea", declara Castro "una cosa rápida. El otro [Soto] que tira la lista y yo que cojo el suiche." Castro indicó a Quiñones que cogiera lo que Soto había tirado, abriendo Quiñones la puerta trasera derecha del automóvil y ocupando las listas. Entonces Castro le dijo a Lake Penn que le dejara el guía, que iba a guiar. Este se echó hacia su derecha, donde estaba Soto Zaragoza, y Castro guió el automóvil desde donde se encontraba hasta frente al cuartel.

Ya en el cuartel, fué registrado Soto Zaragoza, encontrándosele en el bolsillo derecho del gabán, entre otros, un papel amarillo con números impresos de tres cifras a lo que el testigo se refiere como "números limitados a cuatro dólares." Entre las listas de números de tres cifras que el testigo vió en las manos de Harry Lake Penn estaba una "grande" que empezaba con el número 101 y contenía después las letras "C.B." y luego el número 15, o sea la cantidad de dinero con la cual se jugaba dicho número combinado. El testigo explicó que las letras C.B. querían decir "combinado", o sea

que se estaban jugando todos los números de tres cifras que pudieran hacerse combinando los tres números contenidos en el 101.

Cuando Castro condujo el carro hasta el cuartel, Quiñones ocupó el asiento de atrás. El carro fué estacionado "en el callejoncito" frente al cuartel. De allí bajaron los detectives con los acusados, llevando a éstos ante el Sargento Costas. Allí fué que Castro registró a Soto Zaragoza encontrándole, además de los papeles ya mencionados, una cartera en el bolsillo izquierdo trasero conteniendo dinero. Castro no contó el dinero, aun cuando abrió la cartera y la examinó y vió billetes de $10 y $20, "una gran cantidad de dinero". Le devolvió la cartera sin ocuparle el dinero. Después de esto, Soto Zaragoza "alegó" que él tenía en su automóvil unos documentos de inscripción de caballos y que los detectives eran responsables de esos documentos, a lo que Castro le indicó si él quería fueran a registrar el carro y se los devolverían, asintiendo Soto Zaragoza. El registro lo verificaron los detectives Quiñones y Castro. Ni Costas ni los otros detectives en el cuartel intervinieron en el registro. En el baúl del automóvil encontraron botellas de whisky y en el "dash" tenía billetes de la lotería y unos documentos de inscripción de caballos. La declaración de este testigo termina en la siguiente forma mientras repregunta el abogado defensor:

"P. ¿Testigo, por primera vez cuando ustedes se acercaron al carro lo registraron el carro en ese sitio?

R. No, señor.

P. ¿Cuando lo registraron frente al cuartel lo registraron antes del requerimiento del señor Soto?

R. Después del requerimiento del señor Soto. *Primero habló conmigo y me llamó y me dijo que lo ayudara en ese caso y que pasara luego por la casa.*

*Hon. Juez:* ¿Cómo fué?

R. *Me dice a mí José Soto Zaragoza que lo ayudara en ese caso y que·después pasara por la casa de él.*

*Lcdo. Archilla Laugier:*

P. ¿Se lo dijo en presencia de quién?

R. De nadie.

P. ¿En el Cuartel de la Detective?

R. En una cunetita donde hay un murito.

P. ¿Le dijo eso a usted?

R. Sí, señor.

*Lcdo. Archilla Laugier:* Pues nada más, señor juez." (Bastardillas nuestras.)

Cuando terminó su declaración el detective Castro eran las doce menos diez de la mañana. El abogado defensor no deseaba que el testigo que había declarado pudiera juntarse con los demás porque había "facilidad de comentar el caso" y solicitó que se comenzara con el siguiente testigo. Entonces ocurrió el siguiente diálogo:

*"Hon. Fiscal:* ¿Cuál es el interés en que se traiga ese testigo ahora?

*Hon. Juez:* Yo no veo.

*Hon. Fiscal:* Que me lo diga el abogado.

*Lcdo. Archilla Laugier: Porque ese testigo va a decir la verdad.*

*Hon. Fiscal:* ¿Lo sabe el abogado?

*Lcdo. Archilla Laugier:* Lo sé." (Bastardillas nuestras.)

El juez inferior ordenó entonces que el testigo Federico Quiñones Padró—el otro testigo de cargo con el cual el fiscal había anunciado que terminaría su caso—quedara bajo las reglas de la corte y que el márshal le acompañara a almorzar, que no permitiera que persona alguna le hablara sobre ningún asunto y que regresaran inmediatamente al tribunal.

*Federico Quiñones Padró*, al ser llamado al reanudarse el juicio en la sesión de la tarde, declaró que era detective y que en la noche del 27 de mayo de 1950 prestaba servicios como tal en la zona metropolitana, en el escuadrón contra la prostitución que estaba a cargo del Sargento Luis V. Costas. Como a las once de la noche vió a los acusados en un automóvil Cadillac que estaba estacionado entre el Muelle núm. 12 "y la entrada al puesto de gasolina a la Pontiac", a una distancia "como de 400 y pico de pies aproximadamente" del

cuartel de la detective . El carro miraba hacia Santurce y delante de éste había una guagua comercial. (Según la transcripción de evidencia, el testigo primero situó la guagua a una distancia de 14 a 16 pies del carro y en seguida sitúa la posición del automóvil "como a 6 pulgadas de la guagua".)

Quiñones y Castro caminaron desde el cuartel por la acera hacia San Juan después que Castro al ser preguntado por un muchacho que llegó al cuartel que por qué estaba preso un tal "Pichín" llamó al testigo y salieron en la dirección indicada. Quiñones caminaba por el lado interior de la acera y Castro por la parte de afuera. Ambos llevaban linternas (*flashlights*). Al llegar al automóvil Cadillac el testigo alumbró y vió "en forma de unos números" en manos de los acusados de "cuatro cifras, de cinco, en papeles amarillos, colorao". Castro agarró a Harry Lake Penn que estaba sentado en el asiento delantero frente al guía, diciéndole a Quiñones "Móntate alante y vamos para el cuartel". Soto Zaragoza comentó "Vamos para donde ustedes quieran". Al llegar al cuartel en el automóvil, el testigo, que había ocupado periódicos, billetes de la lotería y una lista de lotería, así como papeles de cuentas de colmados "unas libretas así cuadradas", subió con dicho material y lo puso sobre la mesa de retén. El detective Rivera Rosa salió hacia afuera para registrar el automóvil, llamando al testigo también para que lo registrara. Al abrir Quiñones la puerta encontró en el asiento de atrás, en el suelo, un paquete de "37 listas de bolita", diciéndole a Rivera Rosa "No busques más, aquí está la evidencia". Confrontadas con las que el fiscal tenía en su poder y que habían sido previamente identificadas por el detective Castro, Quiñones negó haber visto dichas listas con anterioridad a ese día. Entonces el fiscal le presentó una declaración jurada que admitió el testigo haber prestado ante el fiscal el día 28 de mayo de 1950 en la fiscalía y haber firmado en su presencia. De ahí en adelante el interrogatorio del fiscal se desarrolló en la siguiente forma:

"*Hon. Fiscal:* Léala en su totalidad.

(El testigo lee la declaración.)

R. Aquí dice que el detective Castro . . . .

*Hon. Fiscal:* No diga lo que dice, cuando usted acabe de leerla me lo informa así.

P. ¿La terminó de leer en su totalidad?

R. Sí, señor. .

P. ¿Dígale al tribunal si eso que dice ahí el fiscal lo obligó a que lo dijera?

R. *A mí no me obligaron.*

P. *¿Lo dijo libre y voluntariamente?*

R. *Lo dije voluntariamente.*

P. Ahora dígale al señor juez si es cierto o no es cierto que usted dijo que usted notó al llegar al carro que estos dos acusados manipulaban con números con guión, de tres cifras y unidad a la derecha, ¿dígame si eso es cierto o no?

R. Yo digo que ví números, yo no tengo vista, vamos a decir a una distancia de 14 pies yo ví números.

P. ¿De manera que usted no dijo esto que dice aquí, números con guión y números a la derecha que los vió en manos de estos acusados?

R. Cuando los ocupé.

P. ¿Dígale al señor juez si es cierto o no es cierto que usted dijo que vió cuando Harry Lake Penn, este señor que está aquí, trató de poner el carro en marcha y Modesto Castro le echó mano? .

R. Le echó mano al carro, volvió y le dió al suiche otra vez.

P. ¿Y mire a ver si es cierto y dijo, Chichí al lado de él, Chichí las cogió junta con las que tenía en la mano izquierda y trató de prender el carro; mire a ver si lo dice ahí o lo puso el fiscal, lo dijo usted o lo puse yo, mire a ver?

R. *Lo dice ahí.*

P. *¿Quién dijo eso?*

R. *Lo dije yo.*

P. ¿Lo dijo usted en la oficina mía?

R. Sí, señor; para corroborar la acusación tengo que decir que lo ví.

P. *¿Eso no se lo dijo el fiscal que lo dijera?*

R. *No me lo dijo nadie.*

P. *¿Lo dijo usted ante mí?*

R. *Sí, señor.*

P. Mire a ver si es cierto que usted dijo, ahí procedimos al

arresto de dichos individuos y la confiscación del carro; que al llegar al cuartel procedimos al registro del carro.

R. Sí.

P. Y el detective Castro encontró en la persona de Chichí, Soto Zaragoza (mírelo ahí) unos papeles con números de bolita o sea números de tres guarismos y números a la derecha.

R. Sí.

P. ¿Mire a ver si es cierto . . . .?

R. Yo registré a este señor.

P. 'Yo registré a este señor', usted señala para fines de récord a Harry Lake Penn.

P. Mire a ver si usted declaró lo que dice aquí: que al llegar al muelle número dos con las luces dentro prendidas del carro, detrás de la guagüita comercial, nos dirigimos a dicho automóvil, yo por el dado derecho y Castro por el izquierdo.

R. Es el 12.

*Hon. Fiscal:* Aquí dice 2 pero es el 12.

R. 12.

P. Alumbramos con un flashlight cada uno.

R. Llevaba flashlight.

P. Al notar que manipulaban y que pasaban este material de bolita porque se le veía con números de guión y números a la derecha. Mire a ver si es cierto.

R. Yo ví números.

P. ¿En manos de quién?

R. En manos de este señor porque estaba bregando con unos números de lotería que tenían alante. Yo aseguro que vi números.

*Hon Juez:* ¿El tenía números dice usted?

R. Tenía números de lotería.

*Hon Fiscal:*

P. ¿Dónde están?

R. Se lo entregarían, no sé.

P. ¿Esas listas que están ahí, dónde se ocuparon, las listas que le mostré ahorita a usted?

R. Las listas que se ocuparon en ese automóvil, es una lista que estaban con un pinchacito.

P. ¿Mire a ver si son éstas, señor? Ese es el pinchacito que usted dice.

R. Ese es el pinchacito, estaban pegadas.

P. ¿Dónde ocuparon esas listas?

R. En el asiento de atrás del carro.

P. ¿Quién tiró esas listas en el asiento?

R. Yo las encontré allí, el que las tiró lo sabrá, el que las tiró.

P. ¿Ahora dígame una cosa, *si usted después de haber prestado esta declaración que usted dice que prestó ante el fiscal, dígale al honorable juez si posteriormente a esta fecha usted compareció ante el fiscal para decirle que esto que dice aquí no es lo cierto?*

R. ....................

*Hon. Juez: Conteste.*

P. ¿Que si usted en alguna ocasión después del 26 de mayo en que usted prestó, que usted acepta que prestó esta declaración, si usted se ha dirigido al fiscal para decirle que lo que dice aquí no es la verdad?

R. Le voy a decir una cosa.

*Hon. Juez: Conteste.*

*Hon. Fiscal: Conteste si ha venido donde mí.*

*Hon. Juez:* La corte le instruye *que conteste* en forma categórica las preguntas que le haga el señor fiscal.

*Hon Fiscal:*

P. ¿Que si usted ha venido donde mí *a decirme que esto que dice aquí no es la verdad, en una fecha posterior?*

R. *Yo no se lo he dicho a usted, yo no le he dicho nada.*

P. ¿A pesar de que dice otra cosa?

R. Estoy diciendo la verdad en nombre de la ley de Dios.

P. ¿Entonces ésta es la declaración?

R. *Esa fué la declaración.*

P. ¿*La prestó en la Fiscalía ante mí?*

R. *Ante usted.*

P. ¿*Lo que dice fué lo que usted dijo?*

R. *Sí, señor.*

P. ¿*Nadie lo obligó a decir esto, lo dijo usted?*

R. *Lo dije yo.*

P. ¿Entonces lo cierto que ese material se le ocupó a estas dos personas?

R. Estaba en el asiento de atrás en el suelo.

P. ¿Cuando llegaron usted vió los números dice que este señor tenía?

R. Yo ocupé unas listas de lotería de premios de ésas y unos billetes de la lotería ordinaria y extraordinaria y una escritura de hipoteca de veintidós mil o treintitrés mil pesos, eso lo ocuparon en el cuarted.

P. ¿Qué hacía este señor?

R. Estaba sentado allí.

P. ¿Y el otro?

R. Sentado.

P. ¿Qué hacían?

R. Sentados.

P. ¿Qué más hacían?

R. Estaban sentados.

P. ¿Qué estaban haciendo?

R. Estaban con unos papeles en la mano.

P. ¿Papeles de qué?

R. De lotería y una lista de lotería y unas libretas como de banco.

P. ¿Dónde están esas listas de lotería? Usted como detective debe saberlo.

R. Se llevaron al cuartel como propiedad de él.

P. ¿Usted todavía es detective?

R. Yo creo que me voy a ir de la detective.

P. ¿Por qué se va a ir?

R. Por un asunto familiar que yo tengo que usted lo conoce. Esto mismo me tiene en confusión señor juez." (Bastardillas nuestras.)

La repregunta de este testigo se inició con la siguiente explicación por él ofrecida para justificar las variaciones en su testimonio en el juicio con relación a su declaración jurada ante el fiscal:

"REPREGUNTA DE LA DEFENSA:

*Lcdo. Archilla Laugier:*

P. ¿Quiñones, usted ha prestado juramento de decir verdad en esta tarde?

R. Sí, señor.

P. ¿Usted ha contestado las preguntas del distinguido fiscal?

R. Sí, señor.

P. Usted ha tenido durante varios incidentes deseos de dirigirse al juez para explicar algo. Yo le pido que explique al juez lo que ha querido explicar.

R. Señor juez, yo estaba esperando esta oportunidad, yo he tenido un problema en casa que hacen . . .

*Hon. Juez:* Hable en alta voz.

R. Perdí un hermano a consecuencia de un accidente de

automóvil y perdí mi padre a los 32 días y a consecuencia de eso tuve que ingresar una hermana mía en el Manicomio Insular. *Esto mismo me hace que dé esa declaración jurada que he admitido que fué jurada.*

*Hon. Juez:* ¿Lo que dice ahí es cierto?

R. *Le presté una declaración al fiscal que tenía ciertos errores, confusiones, errores y he querido venir con mi alma y mi conciencia tranquila.*

*Lcdo. Archilla·Laugier:* Quiero que a tenor con su conciencia limpia le explique la verdad de los hechos·que se·están ventilando aquí hoy al señor juez.

R. Le expliqué al señor fiscal que a ese señor no lo conozco, la primer vez.

*Hon. Juez:* ¿A cual?

R. A ese señor, ése que está ahí.

*Hon. Juez:* ¿Soto Zaragoza?

R. Sí, señor. Los otros detectives lo conocen a él. *Yo no he tenido, entiende, que ir donde una persona que viola la ley a pedirle una peseta, soy un hombre honrado.*

*Hon. Juez:* ¿A alguien lo hace?

R. Yo no digo que lo hacen, quiero decir que no he tenido qué ir a ocuparlos nunca, puedo decirlo. En cualquier sitio le doy prestigio al cuerpo de la policía y se lo daré.aun fuera de él. Ya estoy con la conciencia limpia.

*Lcdo. Archilla Laugier:*

P. ¿Quiere mucho ese prestigio?

R. Soy un hombre honesto, pertenezco a una secta.

P. ¿Perdió su padre, en qué fecha, me perdona que traiga ,este recuerdo a su memoria, en qué fecha perdió a su padre?

R. El día 28, al otro día de haber pasado esto." (Bastardillas nuestras.)

Luego de la anterior explicación, el testigo repitió sustancialmente la declaración dada por el detective Castro en cuanto a la forma en que se acercaron al automóvil desde el cuartel. Entonces continuó diciendo que vió a Lake Penn con unos papeles amarillos, los que éste pasó a Soto Zaragoza. Al subir al asiento delantero ocupó los billetes y la lista de lotería. Castro dió la llave del automóvil a Lake Penn, quien guió hasta el cuartel de la detective. Frente al cuartel, al bajar del automóvil, Soto Zaragoza le dijo al

detective Castro que registrara el carro. Castro sacó del baúl una botella de whisky. En ese momento Quiñones estaba en el cuartel "chequeando números de la lotería a ver si había más números de bolita", y al ser llamado por Rivera Rosa para el registro del carro fué que encontró las listas de bolita en la forma anteriormente dicha. Excepto Rivera Rosa y el detective Castro, ninguna otra persona se acercó al automóvil mientras Quiñones estaba en el cuartel. Castro registró a Soto en el cuartel ocupándole "unos papeles, pedazos como de cuatro o cinco pulgadas con distintos números". Esa misma noche, como a las tres de la mañana, el testigo y el Sargento Costas arrestaron a Lake Penn en un taxi en la Parada 15. El Juez Rodríguez Aponte señaló a Soto una fianza de $5,000 y a Lake Penn una de $1,000 para su libertad provisional. "Estaban trancados los dos en la jaula del cuartel".

El tribunal admitió en evidencia, con la oposición de la defensa, las 37 listas de números de tres cifras con unidades a la derecha y demás documentos que fueron ocupados a los acusados, según el testimonio del detective Castro. También admitió, sin oposición, la declaración jurada prestada por el detective Federico Quiñones Padró ante el fiscal, que éste ofreció a los fines de tachar su credibilidad.

La prueba de los acusados comenzó con el testimonio de *Ramón Pérez Méndez*, quien dijo tener 19 años de edad y vivir en la calle Monserrate. A las once de la noche del 27 de mayo de 1950 se encontraba en el "Blue Room" en Santurce, un negocio de su padre, estando allí además de éste y el testigo José Soto Zaragoza. Su padre recibió una llamada telefónica para que le diera aviso a Harry Lake Penn de que su hermano Luis Santos Lake estaba preso. Así lo hizo aquél. Apareció entonces Soto Zaragoza (Chichí) con el carro Cadillac. Pérez y Soto esperaron que Lake Penn se vistiera, yéndose a vestir también Pérez, quien luego se subió al automóvil "por curiosidad". Llegaron "frente al cuartel" bajándose el testigo del carro y preguntando al detec-

tive Castro cuál era la denuncia. Como venían desde Santurce, al bajarse Pérez, Lake Penn y Soto siguieron para virar el automóvil y cogerlo frente al cuartel "para venir a ver si había que poner fianza o algo". Estacionaron el carro "frente del Departamento del Trabajo al lado de la Pontiac". Desde donde estaba el testigo en la puerta del cuartel al sitio donde pararon el automóvil había "de 5 a 10 pies". El carro paró entre el cuartel y el edificio de la Pontiac, donde hay un "pasadizo".

Al inquirir Pérez "cuál era la denuncia de Luis Santos", Castro le dijo "usted anda con Chichí" y entonces Castro y el detective Quiñones "vinieron donde Chichí con un 'flashlight'". El testigo se fué con ellos. Castro se acercó por el lado del chófer y Quiñones por el otro lado pero no le ocuparon nada a los acusados. Ni Soto ni Lake Penn tenían nada en sus manos, ni listas de lotería ni billetes de lotería. Entonces "rebuscaron el carro y entonces se metieron dentro", Castro delante y Quiñones atrás. Pérez trató también de subir al automóvil pero Castro le dijo que no, que se fuera para el cuartel, caminando los otros en el automóvil como 10 pies "y lo pararon frente al cuartel". Castro se quedó en el automóvil y Quiñones subió donde el Sargento Costas, regresando otra vez con dos detectives más. Registraron el carro nuevamente. Al momento de estar registrándolo apareció Quiñones "con páginas de bolita que había sacado de la parte atrás del carro." Entonces Soto dijo "cómo diablos me van a meter preso", contestándole Quiñones "es imposible que yo vaya a meterle bolita en el carro puesto que no lo conozco a usted". Soto les decía "esto les va a costar caro a ustedes, ustedes no me pueden meter preso de esta manera". Mientras el testigo estuvo allí no vió que registraran a Soto ni a Lake Penn. Después que Quiñones encontró las páginas de bolita en el carro, Pérez se marchó para su casa y no vió nada más.

*Jaime Cabre, Jr.*, contable de la City Taxi, Inc., que se dedica a la transportación de pasajeros, declaró que la noche

del 27 de mayo de 1950, según los records de llamadas de dicha corporación, aparecía una del cuartel de la detective para un viaje a Bouret 506 en el carro número 14 guiado por Salvador Arcelay, de 12:20 hasta 12:50 A.M. cuyo importe fué un dólar.

*Salvador Arcelay*, chófer de la City Taxi, recibió instrucciones por radio teléfono para ir al cuartel de la detective. Allí el acusado Lake Penn tomó su taxi y llenaron el carro de unas cajas llevándolo a la calle Bouret núm. 506 donde lo dejó.

*Harry Lake Penn, acusado*, declaró que el 27 de mayo de 1950 a las diez de la noche estaba durmiendo en su casa cuando fué Ramón Pérez y lo llamó informándole que su hermano Luis Santos Lake estaba preso, según llamada recibida por el padre de Pérez. El testigo se vistió y al salir encontró a Soto en el carro. Se dirigieron al cuartel de la detective. "Entonces cuando pasé frente al cuartel poco a poco estaba Castro en la puerta del cuartel y se quedó mirando el carro . . . entonces yo di la vuelta y paré el carro *frente a la entrada que divide el cuartel y el edificio de la Pontiac.*" (Bastardillas nuestras.) Enfrente hay una oficina del gobierno.

Los detectives Castro y Quiñones bajaron del cuartel, Castro por el lado del testigo y Quiñones por el de Soto y les alumbraron las caras con un "flashlight". Ni Lake Penn ni Soto tenían nada en sus manos en esos momentos. Estaban esperando que bajara Ramoncito (se refiere al testigo Ramón Pérez Méndez). El testigo preguntó a Castro por qué los alumbraba y éste dijo "Nada", abriendo la puerta delantera "y empezó a buscar en el carro" diciéndole a Quiñones "Móntate ahí alante". Soto protestó diciéndoles "Ustedes no se pueden montar aquí" pero Castro volvió a decir a Quiñones que se subiera, y éste subió al asiento delantero. El carro estaba "como a diez pasos" del cuartel. "Ramón se iba a montar" pero Castro le dijo que no. "Al ver la acti-

tud de él [de Castro] violenta le di para alante y cuando paré frente al cuartel le di la llave."

Así las cosas, Quiñones se fué para el cuartel y Castro fué a abrir el baúl. Al no poder abrirlo le pidió al testigo que lo hiciera y cuando éste levantó la tapa del baúl se vieron unas cajas de bebidas que allí había. Soto y Lake Penn comenzaron a sacarlas. En eso regresó Quiñones con otros dos detectives, Luis Parrilla y Rivera Rosa. Mientras sacaban las cajas, Quiñones abrió la puerta, diciendo: "Y esto que está aquí, no busquen más". Soto le dijo "Eso ustedes lo han metido ahí, la gente no se mete así a la cárcel". Hasta ese momento no lo habían registrado a él ni a Soto. Al poco rato se llevaron a Soto para dentro del cuartel.

El Sargento Costas bajó y le pidió al testigo que abriera el compartimiento de guantes del carro. Este lo hizo, sacando "unos billetes y unos documentos de inscripción de caballos". Costas le dió órdenes a Rivera Rosa para que hiciera un inventario y Lake Penn lo firmara. El inventario incluyó las botellas, las cajas de bebidas y el documento de inscripción de caballos, diciéndole Costas "Usted se puede llevar todo eso". Así lo hizo en un taxi que le llamó un detective y lo llevó a la calle Bouret núm. 506. De aquí el testigo dice que "cogí el otro carro y volví para la 15 y estaba hablando con los muchachos y me dicen: 'Cómo es eso que a ti te soltaron'. *Yo no estaba metío en ese revolú* y me fuí a guardar el carro y cuando lo estoy cerrando, como a las dos horas y pico que estoy cerrando el carro se aparece el Sargento Costas, Quiñones, Parrilla, Rivera Rosa y Castro." Estos, menos Costas, le registraron el carro. El testigo les dijo "regístreme uno solo porque ahora mismo nos metieron unos papeles frente al cuartel". Nada encontraron, pero no obstante fué arrestado—como de tres a tres y treinta de la mañana—e ingresado en la Cárcel de la Princesa después de llevarlo donde el juez.

A pesar de haber sido el chófer de José Soto Zaragoza como por diez o quince años, el testigo sabe que Soto "tiene

muchas casas, en Barrio Obrero y en la Parada 15", pero que "además de casas no sé" qué más tiene. Cuando llegó a la cárcel ya Soto había salido. Al ser preguntado por el fiscal "¿Estas listas, señor, de dónde fué que salieron?" contestó "Esas listas fué que el señor detective Quiñones subió al cuartel y bajó en unión a los otros detectives. Yo vi que apeó Quiñones y abrió la puerta y dijo 'Estos papeles que están aquí, no busquen más na' ". El testigo vió esa noche al juez municipal en el cuartel.

Se estipuló por el fiscal y la defensa que de declarar el funcionario que hizo el ingreso de José Soto Zaragoza en la cárcel, dicho testimonio sería en el sentido de que entre los efectos que "entregó allí José Soto Zaragoza no se encontraba la cartera y que sí tenía la suma de $1,937".

Sometido así el caso, el Juez Francisco Torres Aguiar, que presidía el tribunal, dando entero crédito al testimonio del detective Modesto Castro—aparte de considerar que el del detective Federico Quiñones Padró corroboraba en sustancia el de Castro, no obstante las contradicciones entre su testimonio prestado en el juicio y el prestado ante el fiscal —declaró culpables a los acusados y los sentenció a cumplir, a José Soto Zaragoza la pena de dos años y Lake Penn la pena de un año de cárcel.

El juicio se celebró el 30 de junio de 1950 habiéndose dictado la anterior sentencia en esa misma fecha. El 3 de julio siguiente los acusados solicitaron del juez sentenciador que dejara sin efecto la sentencia por el fundamento de que "los acusados han descubierto prueba que habrá de convencer al tribunal de su inocencia, proponiéndose para ello formular una petición de nuevo juicio, impidiéndoselo el hecho de que la corte dictó sentencia en el caso." La moción de nuevo juicio fué radicada el día 10, alegándose en ella, en lo pertinente, lo que sigue:

"2. Que en el acto del juicio los acusados sostuvieron como defensa que los hechos que se les imputaban eran el resultado de una confabulación por parte de los testigos del Pueblo de

Puerto Rico quienes colocaron en el automóvil ocupado por los acusados la evidencia que tendía a incriminarlos y en virtud de la cual fueron condenados.

"3. Que los acusados han descubierto nuevas pruebas que de haber sido presentadas en el acto del juicio hubieran variado el resultado del mismo, obteniendo los acusados una sentencia absolutoria, consistente dicha prueba en la declaración del testigo Luis Santos a los efectos de que la evidencia alegadamente ocupada a los acusados en la noche del 27 de mayo de 1950, le había sido ocupada a dicho Luis Santos, horas antes del arresto de los acusados, en las inmediaciones del cuartel de la Detective Insular en Puerta de Tierra, Puerto Rico.

"4. Que los acusados desconocían hasta el momento mismo del juicio la evidencia que habría de ser utilizada en su contra, no siendo hasta el día 3 de julio de 1950 que los acusados tuvieron conocimiento de la procedencia de la evidencia presentada en su contra.

5. Que los acusados acompañan a y hacen formar parte de esta moción la declaración jurada suscrita por Luis Santos."

En la declaración jurada de Luis Santos a que se hace referencia en dicha moción, prestada por éste el 5 de julio de 1950, dicho testigo hizo constar lo siguiente:

". . . Que el día 27 de mayo de 1950, como de diez a diez y media de la noche me sorprendieron la detective con varias listas de bolita las cuales me fueron ocupadas siendo conducido hasta el cuartel de la detective en la parada seis y media en Puerta de Tierra, habiéndoseme ocupado dichas listas.

"3. Durante el juicio que se celebró el día 30 de junio de 1950 en la Corte de Distrito de San Juan contra José Soto Zaragoza y Harry Lake Penn *yo estuve presente* y puedo asegurar y aseguro bajo juramento que las listas de bolita que fueron presentadas contra los acusados José Soto Zaragoza y Harry Lake Penn como que eran poseídas por éstos fueron partes de las listas que me fueron ocupadas a mí en la noche del 27 de mayo de 1950.

"4. Que las listas que me fueron ocupadas esa noche tenían una identificación por la parte de atrás de cada una y que esa identificación de las listas presentadas contra José Soto Zaragoza y Harry Lake Penn correspondía a las que me fueron ocupadas a mí. . . ." (Bastardillas nuestras.)

Tanto la moción para dejar sin efecto la sentencia como la de nuevo juicio fueron declaradas sin lugar el 12 de julio y en esa misma fecha apelaron los acusados. El 16 de enero de 1951, luego de haber éstos perfeccionado su apelación y estar radicados los alegatos tanto suyos como apelantes como de El Pueblo como apelado, solicitaron de este Tribunal que les tuviera por desistidos de su apelación, anunciando que en virtud de nuevas pruebas descubiertas con posterioridad a la sentencia, indicativas de que la usada en su contra el día del juicio fué producto de fraude, se proponían acudir de nuevo al tribunal inferior en solicitud del remedio procedente para que dejara sin efecto dicha sentencia. Tenidos por desistidos de su recurso, acudió José Soto Zaragoza al tribunal inferior el 22 de enero de 1951 solicitando la nulidad de la sentencia dictada en su contra aduciendo como fundamento lo siguiente:

"2. La referida sentencia fué dictada a base de los testimonios de dos detectives y de un paquete conteniendo listas de números del juego de la Bolita.

"3. La referida prueba documental y testifical es falsa y fraudulenta y fué el resultado de colusión habida para, a sabiendas, hacer aparecer las referidas listas de números como si hubiesen sido ocupadas en poder y en el automóvil de este acusado, siendo lo cierto que dichas listas habían sido ocupadas la misma noche en que se arrestó al acusado, varias horas antes, en poder de otras personas que fueron arrestadas esa misma noche por el mismo delito; que las listas ocupadas como se ha dicho a las otras personas fueron fraccionadas o separadas, a fin de introducir en el automóvil de este acusado parte de dichas listas y declarar luego que allí habían sido ocupadas; y que la sentencia así obtenida está viciada de fraude y de perjurio.

"4. En la fecha en que se celebró el juicio del acusado en el presente caso, durante el juicio y hasta después de dictada la sentencia en el mismo, el acusado ignoraba los hechos aquí expuestos, por lo que le fué imposible poder someter evidencia de los mismos a este Hon. Tribunal, especialmente habida cuenta de que por haberse dictado sentencia en este caso inmediatamente después de practicada la prueba, el acusado no tuvo oportunidad alguna de obtener la celebración de un nuevo juicio, una vez des-

cubierta la evidencia justificativa del fraude, perjurio y colusión que mediaron en este caso...."

PRUEBA PASADA EN LA VISTA DE LA MOCIÓN SOBRE<br>NULIDAD DE SENTENCIA.

El Juez Rodolfo Ramírez Pabón, ante quien se celebró la vista de la moción sobre nulidad de sentencia, tuvo ante sí la siguiente prueba:

*Luis Santos Lake,* medio hermano de Harry Lake Penn, declaró que el 27 de mayo de 1950 fué arrestado como a las nueve de la noche en la Parada 15 por tener listas de bolita en su poder. Le ocupó la detective tres paquetes de dichas listas (de las colectas que había hecho) en el bolsillo de atrás del pantalón. Un paquete lo traía del Barrio Oberro y dos de la calle Loíza. Uno de los grupos o paquetes de listas estaba identificado con el número 6 al dorso de cada una de las listas de ese grupo, otro con el número 14 y otro con la palabra "Río", que significaba Barrio Obrero. Al ser arrestado fué conducido al cuartel de la detective en la Parada 6½ y lo metieron en la "jaula". Pusieron las listas en un escritorio y no las vió más.

El testigo, quien se declaró culpable el 6 de julio de 1950 de la acusación contra él radicada, siendo sentenciado a seis meses de cárcel, estuvo presente en el juicio celebrado el 13 de ese mes contra Francisco Vázquez Ortiz y Luis Muskus, arrestados conjuntamente con él el 27 de mayo. Durante este juicio le llamó la atención "que las listas del número 14 tenían muchos menos páginas que las que me habían ocupado a mí." También estuvo presente durante "algunas partes" del juicio contra José Soto Zaragoza. (Celebrado el 30 de junio de 1950.)

Las tres colectas eran más o menos iguales. El testigo identificó el grupo de listas marcadas con el número 6 al dorso, 62 listas en total. También el grupo de listas del Barrio Obrero, en total 57, y el grupo de las listas con el número 14, que contenía únicamente once listas. Estas listas habían

sido presentadas en evidencia en el juicio contra Francisco Vázquez y Luis Muskus.

El testigo identificó luego las listas de números de bolita que fueron presentadas en el caso contra José Soto Zaragoza y Harry Lake Penn y preguntado si las había visto antes de ese día contestó que las había visto. "Las ví en la corte el día aquél, en la sala aquella (refiriéndose a la Sala "C") y las vi el día que las traía yo." Explicó que las listas que se le habían presentado contenían al dorso el número "14", que parecía un "17". Esa misma era la identificación de las 11 listas pertenecientes a la colecta del "14" que se había presentado en el juicio contra Francisco Vázquez y Luis Muskus, y que unas y otras pertenecían a la colecta del "14" que él traía la noche que fué arrestado. El número 14 se lo ponían a las listas al dorso "para identificarse las personas que van a recoger".

Preguntado si conocía algún otro detalle por el cual podría fortalecer su afirmación de que las listas presentadas en el juicio contra Soto y Lake Penn eran parte de las listas que se le ocuparon a él, declaró que recordaba haberle jugado el número 101 CB con 15¢ a un bolitero llamado Pedrín Santiago que recogía para el "14". Con el 14 se identificaba al colector que recogía las listas. El número 101 CB no aparecía en las 11 listas de la colecta del "14" que fueron presentadas en evidencia en el caso contra Vázquez, pero apareció en el grupo de las 37 listas presentadas en el caso contra Soto. El mismo número 101 CB 15 fué mencionado por el detective Modesto Castro en el juicio contra Soto y Lake Penn el 30 de junio de 1950 al referirse a una de las listas de bolita que estaba identificando de entre las que ocupó a los acusados. (Por formar parte de la evidencia en la apelación que Soto y Lake Penn habían entablado para ante el Tribunal Supremo, estas listas estaban en poder del Secretario de este Tribunal, quien las llevó el día de la vista de la moción en un sobre pegado y sellado sobre el cual había una certificación del secretario del tribunal inferior.)

El testigo recolectaba bolita para Roberto Andújar en la calle Loíza y en ningún otro sitio. No conocía ningún otro bolitero. A Soto Zaragoza lo había visto en la Parada 15. No sabía a lo que se dedicaba Soto ni lo había oído nunca "mentar" entre los boliteros de Santurce a. pesar de que su hermano (Harry Lake Penn) es el chófer de Soto. Hacía solamente dos meses que estaba trabajando en la bolita para Roberto Andújar, pues siempre había trabajado de herrero. Nunca recogió bolita para "Chichí" (Soto). El 27 de mayo cuando arrestaron al testigo no conocía al Lic. Gustavo Jiménez Sicardó, pero después del juicio de Soto habló con él en su oficina "y le pregunté que. averiguara a ver si las listas tenían . . .si tenían el núm. 14". Él fué donde el Lic. Jiménez Sicardó, aunque no lo conocía, "porque el hermano mío lo metieron en esto". No sabía cuánto tiempo llevaba su hermano como chófer de Soto.

El testigo no sabía como se llamaba la persona que recogía bajo el número 14. Estuvo dos veces en su casa. Algunas veces iba y le preguntaba si ya estaba la colecta y si le decía que sí, la recogía debajo de un zafacón cerca de un bar verde en la calle Loíza. El testigo nunca contaba las listas. La noche de su arresto venía "de la Marina", donde cogieron gasolina, en un automóvil con Francisco Vázquez. Además estaban en el carro Muskus y seis mujeres. No sabía qué marca ni de quién era el automóvil. Identificó un grupo de listas de las presentadas en el juicio contra Vázquez y Muskus, que estaban unidas por unos ganchos de máquina. Dentro de ese grupo había listas que no tenían al dorso ni el número 6, ni el número 14 ni "Río" manifestando, sin embargo, que en la primera de las páginas de este último grupo aparecía la palabra "Río" perteneciendo todas las hojas de ese grupo a la colecta del Barrio Obrero. No fué a ver al Lic. Jiménez Sicardó antes del juicio de Soto Zaragoza porque aunque sabía que los habían cogido con bolita "no sabía las colectas que les habían cogido ni nada". Dijo que no era posible dentro de la maquinaria del juego de la bolita que dos personas distintas

tuvieran el número 14. Interrogado por qué no podía ser, se expresó así: "Si usted tiene el 14 y usted ha jugado el 897 y sale el 897 con el número 14 puede venir a reclamar el número. P.—Explique mejor, yo no entiendo. R.—Usted tiene el 14 y Jiménez Sicardó se pone el 14; usted juega el 897 Jiménez Sicardó puede venir y dice: Yo gané. J.—¿Por qué puede venir? R.—Porque los dos tienen el número 14."

El testigo era el único encargado por Andújar de recoger las listas del número 14, y el día del arresto recogió todas las listas del "14". Éste recogía solamente para la banca de Andújar. El testigo miraba por encima de las listas del 14 cuando las recogía debajo del zafacón y no las contaba. Las listas que le fueron ocupadas el 27 de mayo correspondían a la tirada del domingo 28, pero no tenían fecha porque nunca se les pone fecha.

*Gustavo Jiménez Sicardó*, abogado, declaró que el día 30 de junio de 1950, después que se terminó el juicio contra Soto y Lake Penn y éstos fueron condenados por el Juez Torres Aguiar, el abogado Archilla, Miguel Soto (hermano del acusado José Soto Zaragoza) y el testigo fueron a su oficina "a ver lo que se hacía, si se apelaba, etc." Como a los quince minutos llegó Luis Santos a quien el testigo no conocía hasta entonces y le dijo "para mí esa evidencia que le han puesto a Soto son los papeles que me cogieron a mí". Al inquirir el testigo "¿Cómo?", le replicó: "Váyase allá y mire por detrás a ver lo que tienen." Fué a la corte y examinó los documentos y notó que tenían al dorso "como un 17" y al indicárselo así a Santos, éste le dijo que eran los mismos. No pudo ver las listas en el caso contra Santos porque el caso no se había visto y el fiscal no se las dejó ver.

Santos se declaró culpable el 6 de julio. El testigo fué entonces a ver los documentos en la secretaría y pudo comprobar que los dos números 14 eran iguales, "se veía que el 14 de los papeles de Soto había sido hecho por la misma mano que los papeles de Santos." El 13 de julio se celebró el juicio contra Vázquez y Muskus. Vázquez fué declarado culpable y

Muskus absuelto. El fiscal admitió en dicho juicio que la mano que había hecho el 14 en las listas de Soto era la que había hecho el 14 en las listas de Santos.

Vázquez le había dicho al testigo que una lista de "números limitados" que apareció en los papeles de Soto era de él y le había sido ocupada al ser arrestado. "Números limitados" son aquéllos "que se limitan porque son los más que se juegan por cuestión de sueños, etc. Por ejemplo, el número de la tablilla del carro del banquero lo limitan porque lo juegan mucho." Oyó declarar a Vázquez "que él vió que el Sargento Costas se metió a la oficina y de los papeles que le había cogido a Luis Santos cogió unos pocos y se acercó al carro de José Soto Zaragoza". Con relación a lo declarado por Santos en cuanto a que él jugó el número 101 CB con quince centavos, el testigo manifestó que "cuando se señaló esta moción" Santos fué a su oficina y él le preguntó si además de la identificación del "14" había alguna otra manera en que Santos podía identificar los papeles. Santos se quedó pensando y le contestó: "En esa colecta del 14 yo acostumbraba jugar el 101 CB con 15 centavos y si los papeles míos son los de José Soto o están en los míos o están en los de José Soto." El testigo buscó en los papeles de Luis Santos y no encontró el número 101. Vino al Tribunal Supremo y no pudo "verlos porque estaban dentro de un sobre cerrado."

*Francisco Vázquez Ortiz* declaró que fué arrestado el 27 de mayo de 1950 en unión a Luis Santos, Luis Muskus, la esposa de éste y cinco mujeres más. A las nueve de la noche venía por la carretera Ponce de León hacia San Juan en un Cadillac propiedad de Francisco Carmona Ríos. Se encontró con Luis Santos Lake y éste le pidió que lo llevara al Barrio Obrero. Aceptó el testigo y fueron a echar gasolina a la Parada 14, por la Avenida Fernández Juncos. Estando echando la gasolina se presentó Muskus acompañado de seis mujeres y le pidió que lo llevara al Club Ponceño. El testigo les indicó "que se montaran", que él iba para Barrio Obrero. Al doblar por la Calle Cerra, llegando a la Ferretería San

Expedito, les cruzó un automóvil y de él bajaron cuatro detectives. Luis Santos abrió la puerta y salió corriendo, siendo perseguido por dos de los cuatros detectives regresando éstos con Santos. Todos fueron conducidos al cuartel de la detective en Puerta de Tierra.

A Santos y a Muskus al ser registrados, les encontraron dinero y al testigo le encontraron en la licencia "un papelito amarillo con unos números de imprenta" que venían en un "libro de sueños" y que no tenía relación alguna con el juego de bolita. Identificó un papel amarillo con series de números de tres cifras, de entre la evidencia presentada en el juicio contra Soto Zaragoza, como el mismo papel del libro de sueños que le habían ocupado a él en el cuartel de la detective. Al testigo, a Santos y a Muskus los encerraron en la jaula.

Las listas de bolita que habían ocupado a Santos las puso el detective Castro en el escritorio del Sargento Costas y entre ambos empezaron a abrir los paquetes y regaron las listas sobre el escritorio. Como a las doce llegó un joven preguntando qué le sucedía a Luis Santos y al decirle Castro "Usted anda con ellos", contestó: "Yo ando con Chichí": Costas entonces les dijo a los detectives Castro y Quiñones: "Vayan a dar una vuelta". Como a los quince minutos llegó un carro grande y se paró frente al cuartel, bajando de él Quiñones con un paquete de billetes de la lotería. . Fué a la oficina de Costas y en ese momento salieron Parrilla y Rivera Rosa. Mientras Costas y Quiñones revisaban los billetes de la lotería, Costas cogió un puñado de listas de las que estaban en el escritorio ocupadas a Luis Santos y salió a la calle recostándose de la parte trasera derecha del automóvil. Llevaba las listas en "el puño cerrado". Cuando se separó del automóvil llamó a Quiñones y ya no tenía las listas en las manos. Costas subió y Quiñones fué a buscar "a la parte de atrás del carro", y en eso "se formó una discusión acalorada" entre los detectives y Soto Zaragoza y Lake Penn. No sabe si Quiñones encontró algo cuando fué a buscar en el automóvil.

Antes de bajar Costas con las listas que le habían ocupado a Santos y poner sus manos en el carro, ya los detectives Castro, Rivera Rosa y Parrilla habían registrado el baúl del automóvil. Como a los quince minutos salieron Castro y Costas "y metieron a Soto Zaragoza en la jaula con nosotros". Costas le dijo a Lake Penn que podía llevarse "esas cajas que encontramos en el carro". Le devolvieron los billetes de la lotería y le permitieron llamar un taxi. A Soto no lo registraron personalmente. Santos, Muskus, el testigo y Soto ingresaron en la cárcel de La Princesa. A Lake Penn lo vino a ver en la cárcel por la mañana.

El testigo pudo ver cuando Costas cogió parte de las listas que le habían ocupado a Santos, bajó y las puso en el carro de Soto porque dicho carro estaba "frente por frente a la jaula" a una distancia como de 25 pies, siendo "en la puerta trasera derecha donde Costas metió la mano y dejó caer las listas". Todo esto lo hizo Costas en presencia suya y la primera vez que habló de que vió a Costas coger las listas fué el 11 de octubre de 1950, cuando se lo dijo al Lic. Jiménez Sicardó. Recuerda esa fecha porque el día 12 suspendieron las salidas a los presos que cumplían sentencias por bolita y que trabajaban en la calle. Él trabajaba en el cuartel de la policía de San Juan y al pasar dicho abogado le dijo lo que había visto a Costas hacer. No conocía a Soto pero hizo "amistad de preso" con él en La Princesa.

*Ramón Rivera Vizcarrondo* declaró que dos o tres días antes del arresto de Soto Zaragoza actuaba de jurado en el Tribunal de Distrito de San Juan y estaba sentado en la entrada de la fiscalía. Costas llegó con unos "boliteros" arrestados. "Estaba sentado con esa gente y dijo estas palabras: 'Cogí a estos pequeños y voy a coger a Chichí con o sin colecta' ". No recorbada las demás personas que estaban presentes cuando eso. Inmediatamente que sucedió esto el testigo fué a ver, a su casa, a su amigo Soto Zaragoza, indicándole lo que Costas había dicho. Manifestó que le había dicho a Soto además que fuera donde un fiscal a investigar lo que

él acababa de informarle, y que si no quería ir con él que fuera con su abogado.

Al terminar su declaración este testigo el fiscal solicitó que se citara al Sargento Costas diciendo: "Se le ha hecho una imputación a ese funcionario y es lógico que se defienda." Costas fué citado para que compareciera la mañana siguiente.

*José Soto Zaragoza* declaró que el 27 de mayo su automóvil fué registrado "frente por frente al cuartel" de la detective en Puerta de Tierra por los detectives Quiñones y Castro. El carro tenía la luz interior encendida y los detectives examinaron la parte de atrás con un "flashlight" pero nada encontraron. Quiñones le quitó al testigo unos billetes de la lotería que tenía en sus manos y subió con ellos al cuartel. Castro le quitó las llaves a Lake Penn y fué a registrar el baúl con Parrilla. Al no poder abrirlo, llamó a Lake Penn para que lo abriera, hecho lo cual se encontraron unas cajas de bebidas.

"Castro ordenó a Harry Lake que sacara las cajas de bebidas. Mientras se hacia eso *pasó el Sargento Costas y se recostó sobre la puerta trasera del carro con el brazo derecho hacia adentro del carro mirando para atrás donde estábamos nosotros. Como el carro había sido registrado 2 veces por Parrilla y Rivera y Castro no le di importancia.* Él subió para arriba y al subir fué el detective Quiñones y se dirigió hacia nosotros con unos papeles en las manos y dijo: 'No busquen más, aquí está. Yo le dije: 'Mire bandido, ¿cómo usted dice que esto está aquí? Eso lo metería usted mismo ahí.'" (Bastardillas nuestras.)

Quiñones y Parrilla subieron entonces al cuartel y se fueron con el Sargento Costas para atrás. Dejaron al testigo y a Lake Penn frente al cuartel "sueltos". Como a los 20 minutos Costas y Castro lo llamaron y lo metieron en la jaula con Santos, Vázquez y Muskus. Lake Penn no fué arrestado, yéndose en un taxi con las cajas de licor, los billetes de la lotería y unas medicinas de caballos. El testigo no fué registrado en el cuartel, aunque sí en la cárcel al ingre-

sar, donde le ocuparon la suma de $1,937. Nunca había visto antes las listas de bolita presentadas en evidencia en el juicio en su contra. Explicó la naturaleza de varios otros de los documentos presentados por El Pueblo en dicho juicio.

Soto explicó cómo se juega la bolita. Estuvo en ese negocio "hasta que el detective Virella me hizo un rancho", hasta mayo 3, 1949. El día del juicio estuvo defendido por los abogados Archilla, Jiménez Sicardó y Bosch. Al ser preguntado por el fiscal por qué no se sentó en el juicio a declarar lo que estaba diciendo en esa vista, ocurrió lo siguiente:

"P. ¿Y usted se sentó ese día de su juicio a explicar eso que usted está diciendo ahora?

R. No, señor.

P. ¿Por qué?

R. Porque el caso estuvo mal defendido por el Lcdo. Archilla.

P. ¿Usted sabe cuando un caso está bien llevado, también es abogado?

R. Sí, señor.

P. ¿Y éste está bien llevado?

R. Sí, señor." (1)

El testigo sabía por Rivera Vizcarrondo que lo ocurrídole el 27 de mayo "era un rancho". Lo relacionado con el origen de las listas presentadas en su contra en el juicio lo supo después del juicio, después que lo sentenciaron, "como al mes después".

Soto recuerda la fecha de 3 de mayo de 1949 como la fecha en que se retiró del negocio de bolita porque en esa fecha "me registraron en la calle y no me encontraron nada y luego me registraron en el cuartel y me encontró un papelito en el bolsillo." Entonces siguió el siguiente interrogatorio de la defensa:

"P. ¿A qué fué usted al cuartel?

R. A fiar un hermano de Harry Lake.

_____

(1) La magnífica actuación del Lic. F. Fernández Cuyar en esa vista y en todo el procedimiento ha estado a la altura de su bien ganado y sólido prestigio y honestidad profesional. Nada hay en el récord, sin embargo, que justifique la imputación de Soto al abogado Archilla Laugier de que lo defendió mal en el juicio.

P. ¿Y usted llevaba listas de bolita?

R. ¡Cómo voy a ir yo frente al cuartel con listas de bolita!

P. ¿Usted antes de eso jugaba bolita?

R. Sí, señor. *Antes del 27 de mayo de 1950, sí, señor"*. (Bastardillas nuestras.)

Entonces explicó el testigo el origen del medio usado para identificar las listas, en la siguiente forma:

"P. Usted que conoce esto explique si una misma persona puede tener dos 14.

R. No, señor, no puede ser.

P. ¿Por qué?

R. Porque ese colector le pone a todas las páginas el número 14. A mí una vez me hicieron una pillería. Me entregaban la colecta y no se contaba el número de páginas. Se mandaban 60 páginas y me reclamaban $1 de premio. Yo iba y buscaba la colecta y no la tenía. Le pregunté: ¿Cuántas páginas tenía la colecta? Yo decía 60 y él me decía 61. Como no tenía comprobante tuve que pagar $500. Desde esa yo cogí que cada colector tenía que identificarse con un número. Es igual con el 14. Había que contar las páginas. Al buscar la colecta tenía que contar las páginas.

P. Yo quiero que usted explique. En el caso de cualquier otro individuo que fuera banquero, ¿se podía dar el caso de que dos colectas como éstas del número 14 que dicen que era de Roberto Andújar...?

R. No lo podía tener nada más que uno sólo. Usted si recogía y me entregaba a mí, siempre me entregaba a mí. El colector trabaja solamente con un banquero."

Dijo el testigo, además, que se ponen números distintos en las colectas para que no se sepa el nombre de los colectores y que un mismo banquero no puede tener dos colectores con el número 14 porque se confunden los premios y se puede equivocar al pagarlos.

Por último declaró el testigo que Rivera Vizcarrondo "sabía cómo me hicieron esto y cuando me fué a fiar se lo explicó [lo que dijo el Sargento Costas] a Mieres Calimano", pero que la coincidencia de los dos grupos de listas "se descubrió después del juicio mío".

Se ofrecieron en evidencia por los peticionarios, en el curso de la vista, varios documentos, entre ellos, copia certificada de la transcripción de evidencia del juicio contra Soto y Lake Penn así como la declaración jurada de Luis Santos para fundamentar la moción de nuevo juicio.

*Luis V. Costas*, sargento de la policía insular y comandante de la brigada contra el vicio, declaró, llamado por el fiscal, lo siguiente:

"P. Sargento, ¿allá para el 27 de mayo de 1950 usted recuerda dónde usted prestaba servicios y si a cargo de algún servicio especial?

R. Prestaba servicios en la Zona Metropolitana.

P. ¿A cargo de qué?

R. A cargo de la Brigada contra la Prostitución en aquel entonces.

P. ¿Usted recuerda si el 27 de mayo de 1950 fueron arrestados estos dos acusados y otros acusados con relación al juego de la bolita?

R. Sí, señor, en distintos sitios.

P. Sargento, ¿usted recuerda si el día 27 de mayo de 1950 usted estuvo en esta fiscalía o en la Corte de Distrito con relación a estos arrestos?

R. No, señor.

P. ¿Ese día, qué día era?

R. Si mal no recuerdo era sábado.

P. Sargento, ¿usted conoce a Ramón Rivera Vizcarrondo?

R. De nombre no puedo decirle.

P. ¿Usted conoce a este señor?

R. Lo conozco de vista.

P. ¿Usted habló con él el día 27 de mayo de 1950 o en cualquier fecha anterior en relación a casos de bolita?

R. Nunca he cruzado una palabra con este señor.

P. ¿Usted trajo algún acusado a fiscalía el día 24, 25 o 26 arrestado por bolita?

R. No, señor.

P. ¿Usted está positivamente seguro?

R. Positivamente seguro. En aquel entonces yo operaba únicamente con el escuadrón de prostitución a menos que fuera un caso que sorprendiéramos. Ahora no, ahora tengo los dos escuadrones.

P. Nada más.
*Defensa:*
Nada."

El Juez Ramírez Pabón, ante quien se celebró la vista de la moción solicitando la nulidad de la sentencia, dictó resolución anulando ésta en cuanto a ambos acusados, por el fundamento de que la misma fué obtenida mediante fraude, expresándose en la siguiente forma:

". . . el tribunal concluye que los acusados tienen razón en su alegación de que la prueba documental y testifical que sirvió de base para la sentencia que se les impuso de 30 de junio de 1950 es el resultado de colusión habida para hacer aparecer las listas de números ofrecidas el 30 de junio de 1950 como si hubiesen sidó ocupadas en poder y en el automóvil del acusado José Soto Zaragoza; habiendo llegado además el tribunal a la conclusión de que dichas listas habían sido ocupadas la misma noche en que se arrestó a los acusados en poder de otras personas que fueron arrestadas esa misma noche por el mismo delito; concluyendo asimismo el tribunal que las expresadas listas fueron fraccionadas o separadas y así fraccionadas y separadas se introdujo parte de ellas en el automóvil del acusado José Soto. Zaragoza para hacer aparecer luego en la vista celebrada ante este tribunal el 30 de junio de 1950 que habían sido ocupadas en dicho automóvil. . . ."

El Fiscal de este Tribunal, en apelación, atribuye al juez inferior haber cometido error manifiesto en la apreciación de la prueba. Yo así lo creo. Y voy a explicarme.

El Tribunal en su opinión—al igual que el juez inferior—concede gran virtud a la prueba de los acusados, tomando como base para sus propias conclusiones, hechos que surgen de testimonios desacreditados no sólo por la condición interesada de los testigos, si que también por la palpable falsedad que en sí denotan. Aunque se concede que "los testigos principales del acusado" "obviamente estaban mintiendo en parte de sus testimonios", se indica que "la razón poderosa que indudablemente convenció a la corte inferior de que los boliteros y no los detectives habían dicho la verdad *en cuanto*

*a los hechos principales en controversia* fué la evidencia documental."

Mi opinión es que la evidencia documental en sí nada prueba. Es la prueba oral, la prueba de testigos que "obviamente estaban mintiendo en parte de sus testimonios"—por lo cual sus declaraciones han debido ser puestas en duda según el mandato de ley (artículo 524, Código de Enjuiciamiento Civil, 162 Ley de Evidencia; *Pueblo* v. *Nieves*, 57 D.P.R. 784, 789)—la que sirve de base y tiende a dar color a la alegación de fraude. Esa es la prueba que el juez inferior creyó y que este Tribunal acepta, hasta en sus más inconcebibles extremos, al lanzar sobre un *número de agentes del orden público* el terrible anatema de *corruptos*. La conclusión de que se perpetró un fraude por dichos agentes contra el tribunal inferior—siendo el Sargento Costas el cabecilla de la conspiración—no está justificada.

Las graves implicaciones que pueden derivarse de la opinión del Tribunal, requieren la más detenida consideración y el más racional análisis de los hechos aquí envueltos. ¿Qué interés podían tener el Sargento Costas, el detective Castro y los demás detectives a quienes se atribuye el fraude, para concebir y ejecutar el plan de poner listas de bolita en el automóvil de Soto Zaragoza? ¿Qué prueba superior—y hasta qué grado—tuvo ante sí el juez que conoció de la moción sobre nulidad de sentencia para descartar la prueba en que basó la convicción el juez que presidió el juicio?

Paso a examinar en primer término la evidencia documental. Esta consistió de (1) un grupo de 37 listas de bolita con números de tres cifras, un guión y unidades a la derecha, que fueron las listas presentadas en el juicio contra Soto Zaragoza y Lake Penn. Estas 37 listas tenían al dorso un número 14 que parecía un 17. (2) Un grupo de 11 listas de bolita que también tenían al dorso un número 14 parecido a un 17. Estas 11 listas fueron presentadas como parte de la evidencia documental en el juicio seguido contra Francisco Vázquez Ortiz y Luis Muskus el 13 de julio de 1950 (ya Luis

Santos Lake se había declarado culpable el 6 del mismo mes y año). (3) Dos grupos de listas marcados al dorso, uno con el número 6 y el otro con la palabra "Río", que fué parte de la evidencia documental que también se presentó en dicho juicio. (4) Una lista de "números limitados" en un papel amarillo que fué presentada en el juicio contra Soto Zaragoza y Lake Penn y que Francisco Vázquez Ortiz identificó como una lista de "números de sueños", que le fuera a él ocupada la noche de su arresto en unión a Santos. Es innecesario referirse al resto de la prueba documental.

Como ya dije anteriormente, la evidencia documental en sí nada prueba. El número 14 en forma de 17 al dorso de las 37 listas presentadas en el juicio contra Soto y de las 11 listas presentadas en el juicio contra Francisco Vázquez Ortiz y Muskus, fué hecho por la misma mano, según lo admitió el fiscal en la vista de la moción y ya antes lo había admitido en el juicio contra Vázquez. Pero de ese solo hecho no puede inferirse que ambos grupos de listas formaran parte de la misma colecta, ni que, aun formando parte de la misma colecta, estuvieran necesariamente en manos de Luis Santos al momento de su arresto. ¿No podían ser colectas pertenecientes a distintos días de juego? ¿O grupos de listas de la misma colecta recogidos a distintas horas, con entrega ya efectuada a Soto del grupo que se encontró en su poder?

La opinión del Tribunal parte de la premisa de que "las listas presentadas en evidencia contra Soto Zaragoza y Lake Penn eran parte de la colecta del '14' que Santos recogió durante la noche del 27 de mayo del agente que se identificaba con el '14' ". Para partir de tal premisa es necesario dar entero crédito a la versión de Santos Lake de que él recogía para un tal Roberto Andújar y no para Soto, y de dónde, cuándo y cómo recogía las colectas que hacían los tres agentes identificados con el número 14, el número 6 y "Río". ¿Es acaso digno de crédito ese testigo que obviamente estaba mintiendo al declarar que nunca había oído mencionar a Soto Zaragoza como bolitero (a pesar de que su hermano Harry

Lake Penn era el chófer de Soto) y que no conocía a ningún otro bolitero?

¿Cómo puede explicarse—porque en el récord no hay explicación racional para ello—que Santos Lake, quien según su testimonio estuvo presente durante "algunas partes" del juicio contra José Soto Zaragoza el 30 de junio de 1950, pudiera desde su asiento en el público obtener indicio o sospecha de que las listas presentadas en el juicio podían ser parte de las que le fueron a él ocupadas? ¿Cómo—repito—si al ser identificadas las listas en el juicio contra Soto por el detective Modesto Castro, no se hizo mención por éste ni por el fiscal, ni por ninguno de los abogados defensores, ni por el propio juez que presidía el juicio, de marca o número alguno de identificación al dorso de dichas listas que pudiera dar a Luis Santos Lake conocimiento, a través de lo que oía, de que aquellas listas tenían al dorso un número 14 parecido a un 17? ¿Por qué proceso maravilloso ha podido Santos Lake sospechar que las listas presentadas contra Soto y su hermano Harry Lake eran parte de las que le fueron a él ocupadas el 27 de mayo de 1950, si nada hay en el récord que indique, ni por su propio testimonio ni por el testimonio del abogado Jiménez Sicardó ni por ningún otro testimonio, que Santos Lake se acercara siquiera a la mesa del secretario durante algún receso del tribunal o al terminarse el juicio, o fuera a la oficina del propio secretario y viera, aunque de lejos, las listas presentadas contra Soto?

Ciertamente no se pretenderá decir que Santos Lake, quien estuvo presente "durante el juicio" de Soto según su declaración jurada ante el notario Archilla Laugier el 5 de julio de 1950, y durante "algunas partes" de dicho juicio según declaró en la vista de la moción, tuvo la sospecha de que las listas presentadas contra Soto eran parte de las que a él le ocuparon porque el detective Modesto Castro, al identificar una de las 37 listas presentadas contra Soto declaró en el juicio que la misma comenzaba con el número 101 CB 15 explicando el significado de las letras CB. Tal extremo

ni fué consignado por Santos Lake en su declaración jurada de 5 de julio ante el notario Archilla Laugier ni le fué dicho por él al abogado Jiménez Sicardó hasta que fué a su oficina cuando se señaló la moción sobre nulidad de sentencia, que fué radicada el 22 de enero de 1951.

¡Rara coincidencia! Además del número 14 en forma de 17 con que el testigo identificó las listas que traía cuando fué arrestado, fué también el número 101 CB 15 el que Santos Lake indicó haber jugado a un bolitero de nombre Pedrín Santiago que vendía bolita para el "14". ¡El mismo número 101 CB 15 que el detective Modesto Castro mencionó en el juicio contra Soto y Harry Lake como encabezando una de las listas ocupadas a éstos en el automóvil de Soto la noche del 27 de mayo!

¿Por qué Santos Lake, al ir donde el abogado Jiménez Sicardó inmediatamente después del juicio de Soto para que averiguara si las listas tenían el número 14, no le dijo en esa ocasión que las listas presentadas contra Soto tenían que ser las suyas porque había oído al detective Modesto Castro identificar una de ellas con el número 101 CB 15 que le había jugado a un vendedor del agente 14? ¿Por qué si dicho número fué mencionado por el detective Castro en la sesión de la mañana del juicio contra Soto no lo comunicó en seguida a los abogados defensores de Soto y Lake Penn para poder contribuir de esa manera al esclarecimiento de los hechos por los cuales se estaba juzgando a su propio hermano? ¿No fué ese el propósito que le movió a visitar después del juicio al abogado Jiménez Sicardó, aunque no lo conocía? ¿Por qué tardó más de seis meses Santos Lake —hasta después que fué señalada la moción sobre nulidad de sentencia en enero de 1951—en comunicar al abogado Jiménez Sicardó el detalle sobre el número 101 CB 15 por él jugado a un vendedor del agente 14?

Por otro lado, ¿es razonable pensar que Santos Lake decía la verdad al declarar que no recogía bolita para Soto y sí para Andújar? ¿No era su hermano Harry Lake Penn

hombre de confianza de Soto Zaragoza? ¿Por qué probar suerte Santos Lake, iniciándose en esa actividad, con un bolitero competidor de Soto Zaragoza cuando su hermano hacía quince años que trabajaba para Soto? ¿No resulta ser el tal Andújar el testaferro tras el cual se escuda no sólo Santos Lake si que también Soto Zaragoza? Así parece, pues si se admitiera el hecho de que Santos Lake trabajaba, como su hermano, para Soto, la identificación del número 14 al dorso de las listas presentadas en el juicio contra Soto y de las ocupadas al propio Santos dejaría de tener la significación que se le atribuye. Toda la versión del fraude se vendría abajo. Así, a mi juicio, ha ocurrido. Más adelante lo he de demostrar, cuando examine la declaración del propio Soto en la vista de la moción sobre nulidad de sentencia.

La otra pieza de evidencia mencionada en la opinión del Tribunal en apoyo de la teoría de fraude es la lista de números limitados a que se refirió el detective Modesto Castro en el juicio contra Soto y que le fué ocupada en el bolsillo derecho de su chaquetón cuando fué registrado en el cuartel la noche del 27 de mayo. Esta lista fué presentada en evidencia contra Soto y a ella se refirió en la vista de la moción el testigo Francisco Vázquez Ortiz—al igual que lo hizo en el juicio en su contra—como una de las listas que venía en el "libro de sueños" y que no tenía relación alguna con el juego de bolita, habiendo declarado que dicha lista le había sido ocupada en su poder al ser arrestado en unión a Santos.

No veo cómo puede el Tribunal referirse a esta pieza de evidencia documental como que presta "algún apoyo" a la teoría de fraude, a menos que se dé entero crédito al testigo Vázquez Ortiz. Su testimonio, por lo fantástico e inconcebible de los hechos que relata—que en su desarrollo no se ajustan a las reglas que normalmente rigen la conducta humana—lleva en sí el germen de la falsedad, y no debió merecer del tribunal inferior crédito alguno.

¿Es lógico suponer que Costas, si concibió el plan para poner listas de bolita en el automóvil de Soto lo hiciera tan

cándidamente como lo relata Vázquez, o sea a la vista suya y de todo el mundo? Él lo ve todo desde la jaula. Ve que riegan sobre el escritorio de Costas las listas de bolita que han ocupado a Santos. Ve que Costas coge un puñado de esas listas y baja con ellas "en el puño". Ve la posición que adopta Costas cuando se acerca al automóvil de Soto. Ve cómo introduce su mano en el automóvil. Ve que cuando se retira no lleva ya las listas en el puño. Desde la jaula ha podido ver no sólo a Costas en su oficina cogiendo las listas del escritorio, si que también lo ve poniéndolas en el automóvil, el que sitúa frente por frente a la puerta del cuartel.

¿Es que acaso "un plan deliberadamente trazado y eje- cutado con cuidado" se lleva a cabo en la forma tan despreo- cupada que supone el testimonio de Vázquez Ortiz? Porque Costas sabía que Vázquez, al igual que Luis Santos Lake y Muskus, estaban en la jaula, arrestados por bolita. ¿Por qué hemos de suponer, como se indica en la opinión del Tribunal, "que Costas no se diera cuenta de que ellos lo podían ver o lo estaban observando" o que "quizás Costas pensó que se re- ducía solamente a una cuestión de su palabra ante la palabra de boliteros?" ¿No es precisamente la forma irracional en que se desarrollan los hechos que relata este testigo lo que debió inducir al juez inferior a rechazar su testimonio, el cual ya en otros aspectos está viciado de palpable falsedad? ¿Qué hace este testigo cuando ve a Costas poner las listas en el carro de Soto? A Soto lo arrestan y lo encierran junto con él en la jaula. ¿Le dice algo a Soto? No. ¿Le dice algo a Luis Santos Lake o a Muskus, que juntos con él están en la jaula, de lo que está viendo, para que ellos también vean, o de lo que ha acabado de ver? Tampoco. ¿Le dice algo a alguien antes del juicio de Soto Zaragoza? Nada. Lo calla todo. Fué por primera vez, según él, el 11 de octubre de 1950, mientras trabajaba como preso en el cuartel de la po- licía de San Juan, que al pasar el abogado Jiménez Sicardó le relató a éste lo que había visto a Costas hacer. Sin em- bargo, el abogado Jiménez Sicardó declaró que Vázquez había

declarado sobre este extremo en el juicio en su contra, celebrado el 13 de julio de 1950. Es obvio que Jiménez Sicardó, y no Vázquez, dice verdad.

Por otro lado, ¿no dice Vázquez que luego de separarse Costas del automóvil de Soto (sin que tuviera entonces las listas en sus manos) y al acercarse Quiñones a buscar en la parte de atrás del carro se formó una discusión acalorada entre los detectives, Soto Zaragoza y Lake Penn? ¿No tenía que oír Vázquez las protestas de Soto de que las listas que había ocupado Quiñones en su carro tenían que haber sido puestas allí por alguien? ¿Qué motivos pudo tener Vázquez para callar los hechos que acababa de presenciar, sin referirlos a Soto esa noche cuando fué encerrado con él en la jaula, ni en ningún otro momento con anterioridad al juicio de Soto, permitiendo así que se le condenara con evidencia fraudulenta? ¿No es razonable—y lo más lógico—pensar que si Vázquez hubiera en realidad visto lo que dijo haber visto a Costas hacer, lo hubiera revelado a Soto por lo menos al ingresar ambos en la cárcel esa noche?

¿No es Vázquez la persona que viene manejando otro automóvil *Cadillac*—que dijo pertenecer a Francisco Carmona Ríos—por la Avenida Ponce de León, hacia San Juan, quien al encontrarse con Santos Lake y pedirle éste que lo lleve a Barrio Obrero, accede generosamente? ¿Y no es Vázquez también quien, sin haber iniciado aún su viaje hacia Barrio Obrero con Luis Santos en el automóvil *Cadillac* que no le pertenecía, accede—también generosamente—a llevar en ese mismo automóvil a Muskus y a seis mujeres hasta el Club Ponceño? ¿Tenía tanta autoridad Vázquez para usar libremente el automóvil Cadillac que no le pertenecía como para complacer en seguida a sus amigos?

¿No resulta ser este testigo el que—según él—tenía en su poder el papel amarillo con números de imprenta que describió como que venía en un "libro de sueños" (que fué presentado en evidencia contra Soto) pero que según el abogado Jiménez Sicardó constituía una lista de "números limitados"?

¿No coincide la descripción de esa lista hecha por Jiménez Sicardó con la hecha por el detective Castro en el juicio contra Soto? Castro dijo que era una lista de números limitados a $4.00—explicando Jiménez Sicardó que números limitados son "aquéllos que se limitan porque son los más que se juegan por cuestión de sueños, etc. Por ejemplo el número de la tablilla del carro del banquero lo limitan porque lo juegan mucho." ¿Por qué si Castro declaró que esa lista de números limitados le fué ocupada a Soto en el cuartel luego de su arresto tenemos que aceptar la declaración de Vázquez de que esa lista era suya y que fué a él a quien se la ocuparon y no a Soto? ¿Qué otro elemento de identificación como el que se atribuye a las demás listas de bolita existe con relación a esta lista de números limitados para que esta pieza de evidencia preste "algún apoyo" a la teoría del fraude, si no es dando entero crédito a la versión de Vázquez? Y esa credibilidad ilimitada, ¿tiene justificación?

La evidencia documental, si se aisla de la altamente sospechosa y evidentemente desacreditada prueba oral—que debió ser examinada "con cautela" por el juez inferior sabiendo que no caminaba "por terreno firme", *Pueblo* v. *Nieves*, supra, no es suficiente para sostener la grave imputación de fraude. El tribunal inferior dió crédito a testimonios en los cuales la falsedad arde por combustión espontánea, destruyendo con ella una sentencia de culpabilidad que estuvo basada en testimonios racionales a los cuales dió crédito el juez que presidió el juicio.

Difícilmente puedo yo compartir la opinión del Tribunal en el análisis que hace de "otros dos episodios de carácter negativo que tienden a confirmar la teoría de que se perpetró una celada contra Soto. Los detectives no ocuparon los $1,937 que él tenía; tampoco arrestaron a Lake Penn en el sitio del supuesto delito."

La cartera de Soto fué examinada por el detective Modesto Castro evidentemente para ver si encontraba documentos adicionales relacionados con el juego de la bolita. No

los encontró.  Al notar la gran cantidad de dinero que tenía en ella la devolvió a Soto.  No veo cómo hubiera podido estar justificada la ocupación de ese dinero—$1,937—no ya por un miembro de la detective si que por un juez instructor(²) o un fiscal en la investigación de esos hechos, en vista de que a Soto se le arrestó por *tener en su posesión* listas de bolita, y no por *operar* una banca de bolita, y de que a simple vista podía verse—como lo he observado personalmente de la evidencia elevada en su forma original a este Tribunal—que escasamente podía llegar al centenar de dólares el dinero apuntado en dichas listas.  De hecho, tan sólo aparece apuntada la cantidad de $61.49 en las 37 listas ocupadas a Soto. ¿Qué relación aparente podía tener la crecida suma de $1,937 con la exigua de $61.49, tratándose de un arresto por posesión de listas de bolita, en cuya infracción es necesario —para la confiscación de dinero ocupado a la persona que tiene las listas—que haya una relación directa entre el dinero y las listas, esto es, que surja prima facie que el dinero es producto del juego?  Si apuramos el argumento podría también decirse que debió la detective ocupar las cajas de bebidas que encontraron en el automóvil de Soto y los billetes de lotería, porque Soto pudo haberlos comprado con dinero producido por la bolita.

En cuanto a que Lake Penn no fué arrestado en el sitio del supuesto delito, bastará decir que el detective Castro en el juicio declaró que Soto y Lake Penn—ambos—fueron arrestados al ser sorprendidos con listas de bolita en sus manos por él y el detective Quiñones.  Harry Lake Penn salió del cuartel en un taxi llevándose unas cajas de bebidas que le fueron devueltas.  No fué encerrado en la jaula. Pero, ¿de esa circunstancia debemos concluir que fué una omisión de la detective no arrestar a Lake Penn, yendo tan lejos como afirmar que su arresto varias horas después obe-

---

(²) Recuérdese que un Juez Municipal estuvo la noche de los hechos en el cuartel de la detective, y tenemos que suponer que autorizó, o por lo menos sancionó, la actuación de Castro.

deció a que Costas se dió cuenta de que "el haberlo dejado ir era inconsistente con su cuento fabricado de que Soto y Lake Penn habían manipulado.material de bolita *conjuntamente*?" ¿Por qué vamos a atribuir a Costas, como cabecilla de la conspiración, el haber omitido dar—por estar tan intensamente enfocada su mente en la combinación para hacerle una celada a Soto—"dos pasos obvios que debió dar para evitar la imputación de que la evidencia contra Soto había sido fabricada?"

¿Por qué hemos de pensar que fué una omisión el haber dejado ir a Lake Penn, cuando pudo haber sido un paso dado con miras a descubrir y arrestar cualesquiera otras personas que pudieran estar al servicio de Soto en su maquinaria de juego, ya que necesariamente Lake Penn—hombre de confianza de Soto—habría de comunicarse con esas personas en la víspera misma del día de la jugada, cuando tenían que estarse dando los últimos pasos en esa maquinaria de juego para tenerla lista para el sorteo del siguiente día?

Es también inconcebible que Costas, dos o tres días antes del arresto de Soto, en la fiscalía del Tribunal de Distrito, Sección de San Juan, delante del testigo Rivera Vizcarrondo y de unos boliteros que llevó arrestados, manifestara que iba "a coger a Chichí con o sin colecta". No es razonable pensar que Costas anunciara en público un proyecto tan abyecto.

Sin embargo, a pesar de que Soto sabe, por Rivera Vizcarrondo, lo que ha dicho Costas, va *sin* colecta a ver por qué estaba arrestado Luis Santos Lake, para fiarlo. ¿Por qué, entonces, estaciona su automóvil Cadillac detrás de una guagua comercial, frente a la entrada del Muelle núm. 12 —según los testimonios de Castro y Quiñones en el juicio— a una distancia aproximada de "400 y pico de pies" según dice Quiñónes? ¿Es ése el acto inocente que tiende a insinuar Soto Zaragoza desde la silla de testigos en la vista de la moción, al exclamar: "¡Cómo voy a ir yo frente al cuartel con listas de bolita!" Lejos de eso, por la situación del cuartel de la detective y la distancia de allí al Muelle núm. 12,

así como por la localización del automóvil de Soto—escudado tras la guagua comercial—lógico es concluir que Soto, avesado ya en los medios de burlar la vigilancia de la policía al funcionar su negocio ilegal de bolita, se situó a prudente distancia del cuartel, al amparo y con la protección de la guagua comercial—como quien va a hurtadillas o se agacha para no ser visto—a examinar listas de bolita, mientras enviaba a un tercero al cuartel a enterarse de la situación de Santos Lake.  ¿Por qué si Soto y Lake Penn iban *a fiar* a Santos no fueron ellos mismos al cuartel?  ¿Por qué va a parecer difícil creer que Soto se situara en el sitio y en la forma en que declararon Castro y el propio Quiñones, a sólo unas horas de la jugada del día siguiente, y procediera—para ganar tiempo o quizás para ver el estado de su negocio ante el contratiempo producido por el arresto de Santos Lake—a examinar con su chófer listas de bolita, confiado en no ser visto?

El Juez Torres Aguiar, que presidió el juicio, no creyó la versión de la defensa en el sentido de que el automóvil de Soto se había estacionado a sólo 8 ó 10 pies del cuartel. Estoy, como él, convencido de que lo declarado por Castro y ratificado bajo circunstancias extraordinarias—que más adelante habré de mencionar—por el testimonio de Quiñones en lo relativo a la localización o estacionamiento del vehículo, y a lo cual dió crédito el Juez Torres Aguiar, es lo cierto.

Como puede verse del resumen de la prueba, el día del juicio el detective Quiñones declaró en forma distinta a lo declarado por él ante el fiscal.  Y es aparente que los extremos sobre los cuales varió su declaración eran extremos esenciales.  Es evidente que Quiñones el día del juicio no estaba corrigiendo "errores" o aclarando "confusiones" en su declaración anterior.  Su declaración ese día fué diametralmente opuesta a la que diera ante el fiscal, sobre hechos fundamentales.

¿Qué motivos tuvo Quiñones para variar su declaración? Nada hay en el récord que pueda darnos una explicación satisfactoria.  Sí aparece, sin embargo, patente y claro el hecho

de que habiendo declarado Quiñones ante el fiscal al día siguiente de ocurridos los hechos en forma esencialmente idéntica a la de Castro, no se preocupó por ir—desde el 28 de mayo hasta el 30 de junio—a comunicarle al fiscal la naturaleza de los "errores" o "confusiones" contenidos en su declaración ante él, ni a justificar o explicar los motivos que lo llevaron a cometer esos "errores" o a sufrir esas "confusiones".

Quiñones era un funcionario público y como miembro de la detective debemos suponer que tenía conocimiento de lo que significaba cambiar en el acto del juicio, y por sorpresa para el fiscal, su testimonio. Él sabía que solamente él y Castro habrían de declarar sobre la forma y manera en que ocuparon las listas en el automóvil de Soto. ¿Por qué, pues, esperar al día del juicio para dar la sorpresa desde la silla de los testigos? Es significativo el hecho de que mientras dejó de comunicarse con el fiscal para indicarle los "errores" o "confusiones" de su declaración ante él, evidentemente se comunicó con Soto, pues recuérdese la manifestación del abogado defensor en el juicio al anunciar, refiriéndose a Quiñones y antes de que éste ocupara la silla testifical: "Ese testigo [testigo de cargo] va a decir la verdad", y al preguntarle el fiscal si él lo sabía, manifestó "Lo sé".

¿Qué indujo a Quiñones a mantenerse callado ante el fiscal mientras se comunicaba con los acusados? ¿Qué le indujo a dar la sorpresa el día de juicio, cambiando su declaración en forma tal que barrenaba el caso del fiscal? Las razones dadas por Quiñones—desgracias familiares, según aparecen en sus propias palabras del resumen de la prueba—no podían hacerle crear en su mente un panorama de meras fantasías que le llevara a declarar un día después del arresto de Soto, hechos tan fundamentalmente distintos de los que en el juicio dijo haber ocurrido.

Contrario a Quiñones, Castro no varió su declaración y aparentemente, sin conocer que Quiñones habría de corregir en el juicio "errores" o "confusiones" de su declaración ante

el fiscal, declaró que Soto le había pedido la noche del arresto "que lo ayudara en ese caso y que después pasara por la casa de él".

Al calificar la conducta atribuída a Costas de "corrupta" y "temeraria", el Tribunal afirma que "es significativo el hecho de que Costas nunca negó la imputación de que había puesto listas de bolita en el automóvil de Soto, no obstante el hecho de que él ocupó la silla testifical para negar la imputación comparativamente trivial de que una vez amenazó arrestar a Soto 'con o sin colecta' ". Las implicaciones que de esa afirmación se derivan sobre la conducta de Costas no están justificadas.

Costas fué citado a solicitud del fiscal cuando el testigo Rivera Vizcarrondo hizo a Costas la imputación de haberle oído decir que arrestaría a Soto con o sin colecta. Ocupó al día siguiente la silla de testigos y fué interrogado por el fiscal sobre ese extremo. No fué contrainterrogado. Costas, que no dirigía el caso de El Pueblo, no tenía que negar la imputación de que había puesto las listas de bolita en el automóvil de Soto, porque sobre eso no se le preguntó. Evidentemente el fiscal jamás pensó que el tribunal habría de dar crédito a la increíble versión del testigo Vázquez Ortiz de que había visto a Costas poner listas de bolita en el automóvil de Soto. Y como ante el tribunal estaba el récord taquigráfico conteniendo la prueba pasada contra Soto en el juicio en el cual fué convicto, nada más tenía entonces que agregar.

La defensa de los acusados en el juicio fué la "defensa favorita, aun cuando casi siempre falsa" de que ellos no tenían nada en sus manos cuando se acercaron los detectives, y de que alguien seguramente puso en el automóvil las listas que encontró Quiñones en el asiento de atrás. Pero es lo cierto que ni el testigo Ramón Pérez Méndez ni el propio acusado Harry Lake Penn dijeron, al declarar en el juicio —como declaró Soto en la vista de la moción—que Costas se recostara del automóvil de Soto. Ni Soto ocupó la silla de

testigos([3]) para decirlo, ni para decir lo que Rivera Vizca-
rrondo le advirtió sobre Costas, ni vino Rivera Vizcarrondo a
decirlo en el juicio a pesar de que éste cuando lo fué "a fiar",
según Soto, se lo explicó al fiscal.  Es en la vista de la moción
que Soto ocupa la silla de testigos para situar a Costas recos-
tado de su automóvil, diciendo que no dió importancia a ese
hecho porque ya habían registrado el carro y nada habían en-
contrado.

¿Es razonable pensar que Soto, advertido de antemano por
Rivera Vizcarrondo del propósito de Costas de cogerlo "con o
sin colecta", no le diera importancia al hecho de que Costas se
recostara de su automóvil—sino en el momento mismo en que
Costas se recuesta—por lo menos cuando Quiñones encuentra,
según Soto, las listas de bolita en el asiento de atrás del carro,
por el mismo sitio en que estuvo Costas?  Es de observarse
que las únicas dos personas que declaran que ven a Costas re-
costarse del automóvil son Francisco Vázquez Ortiz, el testigo
que lo vió todo, y el propio Soto.  Esto ocurrió en la vista de
la moción.

¿Por qué Soto, al encontrar el detective Quiñones las listas
de bolita en su automóvil y exclamar "No busquen más, aquí
está", increpa a Quiñones diciéndole "Mire bandido, ¿cómo
usted dice que esto está aquí?  Eso lo metería usted mismo."
¿Por qué no le atribuye a Costas en ese mismo instante el ha-
berle puesto las listas allí?  ¿No acababa de ver a Costas re-
costado de la puerta trasera del automóvil con el brazo derecho
hacia dentro, por el mismo sitio en que Quiñones encontró las
listas de bolita?  ¿No se lo había anticipado Rivera Vizca-
rrondo?  ¿No habían registrado el carro antes de acercarse a
él Costas y nada habían encontrado?

Aunque Soto declaró en la vista de la moción que se retiró
del negocio de bolita el 3 de mayo de 1949 porque "el detective
Virella me hizo un rancho", al ser preguntado si antes de la
noche en que fué al cuartel a fiar al hermano de Harry Lake

([3]) Véase *Raffel* v. *United States*, 271 U. S. 494, 70 L. ed. 1054.

jugaba bolita contestó "Sí, señor, antes del 27 de mayo de 1950, sí, señor". ¿No se contradice el propio Soto con esta admisión?

El pretexto que da Soto para fijar la fecha del 3 de mayo de 1949 como la fecha en la cual *se retiró* del negocio de bolita fué la de que el detective Virella le había hecho "un rancho". Lo absurdo de este calificativo puede apreciarse de una mera lectura del caso de *Pueblo v. Soto*, supra. Allí Soto fué arrestado junto a Lake Penn y a un tal Santana. Este, según el detective Virella, tenía en sus manos, entre otros papeles, una lista de bolita y estaba recostado del carro de Soto, hablando con Soto, quien al ver a Virella comentó "allá viene Virella", y Santana trató de destruir la lista, guardándose los demás papeles en el bolsillo. Resolvimos que no siendo material de bolita lo que tenía Santana en sus manos, según resolvió la corte inferior, no había causa para el arresto de Soto y por lo tanto su registro fué ilegal. Los hechos elocuentemente indican lo inadecuado del concepto de "rancho" usado por Soto, sobre todo en vista de que en el registro a que fué sometido en el cuartel se le encontró un pequeño papel con dos números de bolita. Evidentemente, para Soto toda intervención de la detective con él es un "rancho".

Lo cierto es que Soto ha admitido, en la forma ya dicha, que antes del 27 de mayo de 1950 (en que se le arrestó por la infracción por la cual fué convicto en el presente caso) jugaba bolita. Pero hay otra admisión de Soto que reviste caracteres de extraordinaria importancia. Es aquélla que se relaciona con el colector número 14. Lo declarado por Soto—que aparece sobre este extremo transcrito en el resumen de la prueba—es una confesión suya de que el colector que usaba el número 14 recogía para él. Es precisamente porque Soto no está afirmando categóricamente que el colector número 14 fuera suyo—lo cual no podía esperarse de él—que sus palabras adquieren verdadera importancia. Soto está explicando que cuando era banquero le hicieron una vez "una pillería". Le entregaban la colecta y no se contaba el número de páginas.

Le reclamaron un dólar de premio de una colecta de 60 páginas. El buscó la página en que podría aparecer el número premiado, sin encontrarla. Preguntó al colector que cuántas páginas tenía la colecta diciéndole éste que 61, mientras Soto decía 60. Como no tenía comprobante tuvo que pagar $500. "Desde ésa yo cogí que cada colector tenía que identificarse con un número. Es igual con el 14. Había que contar las páginas. Al buscar la colecta tenía que contar las páginas."

¿No es Soto en su vida de banquero el que sufre un *timo* de parte de sus agentes o colectores y tiene que pagar un premio de $500, y ante esa experiencia exige que cada colector se identifique con un número? ¿No dice seguidamente que "es igual con el 14" y que "al buscar la colecta tenía que contar las páginas"? Si Soto está atacando la sentencia condenatoria en su contra y ha declarado que un colector trabaja solamente para un banquero, ¿por qué al referirse al "14" lo relaciona con la medida previsora que adoptó en su negocio de bolita como consecuencia de la "pillería" que le hicieron y dice que "es igual con el 14", y que al buscar la colecta había que contar las páginas? ¿No está hablando él de sus propias experiencias en el negocio de bolita? ¿Para qué banquero trabajaba el "14" si no para él mismo? Es la verdad que le sale a flor de labios, sin querer decirla. Por eso dije antes que el tal Andújar resultaba el testaferro tras el cual se escudaba Santos Lake así como también Soto Zaragoza.

Admitido virtualmente por Soto, como he expuesto, que el colector "14" trabajaba para él y hallada parte de la colecta del "14" en manos de Santos Lake, no es difícil llegar a la conclusión de que no ha existido fraude alguno ni que las listas fueron puestas en el automóvil de Soto. ¿Es que vamos a aceptar como buenos los testimonios de boliteros confesos y convictos sobre las prácticas establecidas en sus actividades del negocio de bolita, actividades que, por ser patrimonio exclusivo y estar bajo el único control de ellos, pueden ser ajustadas elásticamente para servir mejor sus propios intereses? ¿No es lo más razonable pensar que Santos Lake había ya re-

cogido y entregado a Soto las 37 listas recogidas del "14" en una primera vuelta, y que luego de recoger el resto en otra visita al "14", así como las del "6" y de "Río" fué sorprendido y arrestado por la detective?   En la prueba del propio Soto hay base para así afirmarlo, pues mientras Santos trae las colectas del "6", del "14" y de "Río" de la calle Loíza y del Barrio Obrero, antes de entregarlas a su banquero detiene a Vázquez para que lo lleve al Barrio Obrero, y antes de ir allá es que lo arrestan.   ¿Para qué volver al Barrio Obrero, si de allá viene?   ¿A quién va a entregarle Santos las colectas que ha traído de la calle Loíza y el Barrio Obrero?   ¿No será que va a dar una nueva vuelta en busca de más colectas?

Es de notarse que Santos, Vázquez y Muskus fueron arrestados en la calle Cerra, en la Parada 15.   ¿No es en la Parada 15, en la calle Monserrate, donde también está Soto cuando el padre del testigo Ramón Pérez Méndez recibe la llamada de que le avise a Harry Lake de que han arrestado a su hermano?   ¿No es en la Parada 15 también donde posteriormente es arrestado Harry Lake Penn mientras hablaba con "los muchachos"?   ¿No surge de la prueba que Soto tenía propiedades en la Parada 15?

Finalmente, ¿no era lógico esperar que Soto, que sabía ya que Santos había sido arrestado—víspera de la jugada por la noche—aprovechara la más mínima oportunidad para revisar la colecta parcial que había recibido de Santos y se apresurara a sacar a éste bajo fianza a fin de poder determinar qué colectas de las recogidas por él le habían sido ocupadas?

Hasta aquí mi análisis de la prueba.   Es ostensible, a mi juicio, el error del juez inferior en su apreciación.   A esa conclusión llego "sin especulaciones y sin forzar implicaciones no necesariamente sostenidas por dicha prueba"; con mi deber de conciencia cumplido al disentir de la opinión del Tribunal y con gran reverencia para mis colegas que al igual que el juez sentenciador han cumplido con su deber a cabalidad.

Al igual que este Tribunal ha hecho en otros casos, *Junta del Muelle* v. *P. R. Am. Sugar Refinery*, 70 D.P.R. 361; *To-*

*rres* v. *Vélez*, 49 D.P.R. 730; *Maldonado* v. *The Porto Rico Drug*, 31 D.P.R. 747, es mi criterio que la resolución apelada debería revocarse por el error apuntado. La regla de que no intervendremos con la apreciación que de la prueba haga un tribunal inferior a menos que se nos demuestre que en dicha apreciación se incurrió en manifiesto error, no por conocida y reiterada resulta inexorable ni inflexible. Precisamente para llegar a la conclusión de que un tribunal inferior incurrió en error manifiesto en la apreciación de la prueba, este Tribunal tiene que escrutar el récord en un proceso mental de racionalización que tiene su origen inevitable en las reglas que rigen la conducta humana. Así tiene que ser, pues no vemos ni oímos declarar a los testigos, ni apreciamos sus gestos ni actitudes. De otra manera, nunca podría un tribunal de apelación revocar una sentencia por ese fundamento.

Yendo, sin embargo, aún más lejos y sin que sea necesario citar autoridad alguna—por ser clara y patente la situación en este caso—creo que la prueba aquí debe aquilatarse por normas ya trazadas en repetidas ocasiones por este Tribunal para situaciones similares. El juez que conoció de la moción, que no fué el que intervino en el juicio, tuvo ante sí no sólo los testigos que declararon en dicha vista, si que también el récord taquigráfico de las declaraciones de los testigos que declararon en el juicio. Ese récord taquigráfico tuvo que ser necesariamente examinado y considerado por el juez inferior conjuntamente con las declaraciones de los testigos que declararon ante él. En cuanto a ese récord, del cual no podemos prescindir al resolver este caso, este Tribunal está en la misma posición que el tribunal inferior para llegar a sus propias conclusiones de hecho. *Encarnación* v. *Salim*, 69 D.P.R. 766; *Nogueras* v. *Muñoz*, 67 D.P.R. 441; *Gómez* v. *Trujillo*, 59 D.P.R. 468.

En este punto deseo hacer claro que no es mi criterio que el juez inferior viniera obligado a rechazar totalmente el testimonio de testigos que hubieren faltado a la verdad en una parte de sus declaraciones. Cité anteriormente el artículo

524 del Código de Enjuiciamiento Civil (162 Ley de Evidencia, y el caso de *Pueblo* v. *Nieves*, supra) conociendo en toda su significación la interpretación dada en dicho caso por este Tribunal a dicho precepto. Lo hice precisamente para indicar la cautela con que el juez inferior debió haber recibido la prueba en apoyo de la teoría de fraude. Y como un motivo más para indicar por qué su apreciación de dicha prueba fué manifiestamente errónea.

En vista de lo anterior, es mi opinión que la resolución que anuló la sentencia condenando a Soto Zaragoza y Lake Penn a dos años y un año de cárcel respectivamente, debería revocarse y dejarse dicha sentencia en todo su vigor.